715 P.2d 721

STATE of Arizona, Appellee,

v.

Michael Emerson CORRELL, Appellant.

No. 6437.

Supreme Court of Arizona,
In Banc.

Jan. 28, 1986.

470

one count of attempted first degree murder, A.R.S. §§ 13–1001, –1105, four counts of kidnapping, A.R.S. § 13–1304, one count of armed robbery, A.R.S. § 13–1904, and one count of first degree burglary, A.R.S. § 13–1508. Defendant was sentenced to death on each of the murder counts; life imprisonment on the other counts. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4035.

The defendant presents several issues for review:

A. Pretrial
1. Was defendant's right to confrontation denied by the procedure followed in disposing of the Rule 11 motion?
2. Did the trial court err in refusing to preclude mention of defendant's alias?
3. Did the trial court err in allowing the state to impeach defendant with prior felony convictions?

B. Trial
1. Did the trial court err in admitting photographs of the victims?
2. Did the trial court err in denying defendant's motion for mistrial which was based on a witness' inadvertent mention of inadmissible evidence?

C. Sentencing
1. Did the trial court err in making its *Enmund* finding?
2. Did the trial court err in finding the aggravating circumstances of A.R.S. § 13–703(F)(2), (5), (6)?
3. Was the application of A.R.S. § 13–703(F)(8) *ex post facto?*
4. Did the trial court err in concluding that no mitigating factors existed?
5. Was the special verdict impermissibly vague?
6. Is Arizona's death penalty statute unconstitutional?

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Diane Hienton, Asst. Attys. Gen., Phoenix, for appellee.

Wisdom, Logan & McNulty by James Logan, Phoenix, for appellant.

CAMERON, Justice.

Defendant was convicted of three counts of first degree murder, A.R.S. § 13–1105,

The facts follow. On the night of 11 April 1984, as Guy Snelling and his girlfriend, Debra Rosen, were getting ready to

go to sleep, a knock came at the door of his mobile home. Snelling answered the door, and it was John Nabors, a co-worker of Snelling. With Nabors was defendant whom Nabors introduced as "Rick". At trial, evidence indicated that defendant often used the alias of "Rick Watson".

Snelling let the two men into the mobile home. Shortly thereafter, Nabors pulled out a gun and demanded money. Debra was ordered out of the bedroom, and defendant secured both Debra's and Guy's hands behind their backs with duct tape. Debra was then taken into another bedroom.

Almost immediately thereafter, Robin Cady and Shawn D'Brito drove up outside the trailer. Robin Cady rented a room from Snelling and she and D'Brito were just returning from a date. After they entered, Nabor put the gun to Snelling's head and told the couple, "You guys just walked into a whole bunch of shit."

Defendant taped Cady's and D'Brito's hands behind their backs with duct tape. Then, defendant and Nabors escorted Snelling through the house searching for money and valuables. From time to time Nabors would give defendant the gun to hold on Snelling or one of the other victims.

After searching the house for valuables, Nabors and defendant left the trailer and took three victims with them. Nabors and defendant forced Cady, D'Brito, and Snelling into Cady's car. Defendant sat in the driver's seat and held a gun on the three passengers. Nabors then explained that he was going back into the trailer to secure Rosen. When he returned to the car, they drove to a deserted area nearby, where Nabors' car was parked. Nabors took his car and followed defendant, who was still driving Cady's car with the three victims.

Defendant and Nabors drove to a desert area north of Phoenix where they parked both cars. Defendant and Nabors removed all three victims and made them lie face down on the ground. At this time defendant was holding the gun. Defendant told Snelling he was going to knock him out, but instead shot Snelling in the back of the head. Miraculously, Snelling not only survived but also remained conscious and was able to see the events that followed.

Nabors now had the gun. He shot D'Brito, and then he tried to shoot Cady. The gun misfired a couple of times, but finally Nabors was successful in shooting and killing Cady.

After defendant and Nabors left the scene, Snelling ran to a nearby house to call his parents. He asked them to go to his trailer to rescue Debra before "Rick" and Nabors had time to return and kill her. His parents were too late however. When they arrived, Debra had already been killed by strangulation.

Snelling then contacted the police. He told them of Nabors and also gave a description of "Rick". Several days later, Nabors killed himself during a gun battle with police. Defendant was later apprehended by police.

## A. PRETRIAL MOTIONS
### RULE 11 HEARING

■ Defendant first contends that he was denied the right to confront witnesses against him in violation of the United States and the Arizona Constitutions. U.S. Const. amend. VI; Ariz. Const. art. 2, § 24. Less than a week before trial, defendant filed a motion for a mental examination pursuant to Rule 11, Rules of Criminal Procedure, 17 A.R.S.. On 12 October, between hearings on other matters, the trial judge mentioned to counsel that he had received the Rule 11 motion. Then, the trial judge stated:

Pursuant to the local policy in this county, I immediately called Dr. Garcia-Bunuel, the chief psychiatrist in the county, ... Good Dr. Garcia said that he would examine the defendant, I believe, by Friday, and let us know informally as to whether, in his opinion, there was cause to proceed with a full Rule 11 examination or not. He advised me, informally by telephone, then, that he would follow up later with a written report as re-

quired. As of this moment, I have not yet heard from Dr. Garcia.

On 15 October, the trial judge told counsel that he had received a telephone call from Dr. Garcia-Bunuel who told the judge that defendant was competent to stand trial under Rule 11. Defense counsel did not object to the informal reporting procedure followed by the trial judge on 12 October, nor did defense counsel object when the trial judge related that Dr. Garcia-Bunuel found defendant competent. Finally before ruling on the Rule 11 motion, the trial judge requested of defense counsel any further information indicating "reasonable grounds" for an examination. Defense counsel replied that he had none. The trial judge then denied the Rule 11 motion. Defendant now contends that this procedure denied him the opportunity to confront Dr. Garcia-Bunuel and to cross-examine him.

In Arizona, a person cannot be convicted, sentenced or punished for a crime if, due to a mental illness, he is unable to understand the proceedings against him or to assist in his own defense. Rule 11.1, Ariz.R.Crim.P. 17 A.R.S. (hereinafter Rule ___). Rule 11 provides that at any time after defendant is indicted, any party may move for an examination to determine defendant's competency to stand trial. Rule 11.2. Once a party moves for a Rule 11 examination, the court must determine that "reasonable grounds" for an examination exist. Rule 11.3. If the court does find that "reasonable grounds" exist, then the court shall appoint at least two mental health experts to examine the defendant and to testify regarding his mental condition. *Id.* Only after the examination by the two mental health experts has been completed does the court hold a hearing to determine competency to stand trial. Rule 11.5(a).

In the instant case, the trial court was only called upon to determine whether reasonable grounds for an examination existed. The trial judge appointed a psychiatrist to assist him in his determination and after talking to him, his determination was that reasonable grounds did not exist for proceeding further. A recent decision by

this court reviewed a similar procedure. In *State v. Johnson*, 147 Ariz. 395, 710 P.2d 1050 (1985), the same Dr. Garcia-Bunuel as in the instant case, was asked to determine whether a full Rule 11 examination was necessary. Dr. Garcia-Bunuel recommended against an extensive examination. Based on Dr. Garcia-Bunuel's opinion and the judge's own observations of the defendant, he found no reasonable grounds for the formal examination and denied the motion. 147 Ariz. at 398, 710 P.2d at 1053. Concerning the appointment of a psychiatrist in *Johnson*, we said, "[t]he procedure adopted demonstrates the trial court's care and effort to properly determine the existence of 'reasonable grounds'.... [W]e believe the procedure is both salutary and well within the court's discretion." *Id.* The procedure employed in the instant case was procedurally proper under our rules. *Johnson, supra.*

As to the constitutional issue, we note that defense counsel did not object at any time to the procedure used by the trial court. Failure to object usually waives the matter on appeal unless the matter involves fundamental error. *State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). The right of confrontation, which includes the right to cross-examine witnesses, is a fundamental right. The United States Supreme Court in *Pointer v. State of Texas* said that "the Sixth Amendment's right of an accused to confront witnesses against him is ... a fundamental right ..." and that "the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." 380 U.S. 400, 403–404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965). *See also, State ex rel Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982). We will consider the constitutional question even though not raised in the trial court.

The issue we must decide is whether the procedure used in the instant case denied defendant his right to confrontation and cross-examination. The Sixth Amendment to the United States Constitution states "the accused shall enjoy the right ... to be

confronted with witnesses *against him;* ..." and, Ariz. Const., art. 2, § 24, provides "the accused shall have the right ... to meet the witnesses *against him* face to face, ...". (emphasis added). We believe that in the instant case there is no constitutional issue of confrontation because Dr. Garcia-Bunuel was not a witness *"against him"*.

> Theoretically, there appears to be a distinction between the right to confront witnesses where the report of alienists deals with the defendant's sanity at the time of the crime and where it deals with his sanity at the time of examination or trial.
>
> \*     \*     \*     \*     \*     \*  .
>
> There is more doubt, however, as to the constitutional right to confront the experts in the latter case, since their report has no bearing on defendant's guilt or innocence, but is generally regarded as only intended as an aid to the court in determining whether the trial should proceed.

Annot., 32 A.L.R.2d 434, 453 (1953). While Arizona has never dealt with the constitutionality of this procedure, the federal courts have considered constitutionally-based attacks on former 18 U.S.C. § 4244 (now revised and renumbered, 18 U.S.C. § 4241). That statute provided a procedure to determine mental competency after arrest and before trial very similar to the procedure mandated by Rule 11. In *Caster v. U.S.*, the court stated that "the [federal] statute is benevolent in concept, and the proceeding non-adversary in character, unless and until the psychiatric report reflects a mental condition which calls for a hearing and examination by the Court of the appellant's competence". 319 F.2d 850, 852 (5th Cir.1963). In *U.S. v. Tesfa*, the court, quoting *Caster*, commented that § 4244 proceedings are non-adversarial and that "[e]ven where further inquiry, in the form of a hearing, is called for, it perhaps might best be characterized as *investigatory"*. 404 F.Supp. 1259, 1265–1266 n. 9 (E.D.Pa. 1975) (emphasis added). *See U.S. v. Green*, 544 F.2d 138 (3rd Cir.1976); *U.S. v. Mun-*

*caster*, 345 F.Supp. 970, 974 (M.D.Al.1972). We agree with the discussion by these courts. A trial court's determination that "reasonable grounds" for an examination exist is non-adversary, investigatory and salutary. Defendant's constitutional rights were not violated.

## ALIAS

Evidence indicated that defendant regularly used the name "Rick Watson". His real name is Michael Emerson Correll. Before trial, defendant requested that he be tried under the name "Rick Watson" so as to avoid any possible prejudicial effect arising from witnesses referring to him under this alias. The request was denied. In defendant's brief, he contends that it was error "to introduce evidence that appellant was someone other than Rick Watson." We do not agree.

■ Where the identity of the defendant is an issue, "any fact which tends to establish identity has a probative value and if offered for that purpose it is receivable." *State v. Francis*, 91 Ariz. 219, 222, 371 P.2d 97, 99 (1962) (quoted in *State v. Myers*, 117 Ariz. 79, 85, 570 P.2d 1252, 1258 (1977), *cert. denied*, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978)). Admittedly, aliases should not be introduced solely for the purpose of indicating to the jury that defendant is a criminal. *See State v. Randall*, 8 Ariz.App. 72, 443 P.2d 434 (1968). It is not, however, impermissible for an alias to be introduced when the identity of defendant is an issue. *See U.S. v. Wilkerson*, 456 F.2d 57, 59 (6th Cir.1972), *cert. denied*, 408 U.S. 926, 92 S.Ct. 2507, 33 L.Ed.2d 337 (1972). In the instant case, John Nabors introduced defendant as "Rick". Defendant contended at trial that Snelling had misidentified him. Defendant's identity was an issue and the trial court properly denied the motion to preclude mention of the alias.

## IMPEACHMENT BY PRIOR CONVICTIONS

■ After a hearing, the court ruled that the introduction of defendant's prior felony

convictions was more probative than prejudicial. The trial judge stated:

> The state may only prove the convictions of the felony and the name and the date and location, they're both, all four are apparently in California, without elaboration. I will hold that the probative value of these crimes does outweigh the prejudicial aspect. Indeed, I think the probative value comes from the nature of the offenses and not just that they were felonies.

Defendant contends that because of the adverse ruling on his motion to preclude use of the prior convictions, defendant did not testify.

The issue in the instant case is very similar to one in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), which we expressly followed in *State v. Allie,* 147 Ariz. 320, 327, 710 P.2d 430, 437 (1985). In *Luce,* the petitioner contended that the district court erred in denying a motion *in limine* to preclude the prior convictions for impeachment because the District Court did not make an explicit finding that the probative value outweighed the prejudicial effect. The United States Supreme Court noted:

> [w]hen the defendant does not testify, the reviewing court also has no way of knowing whether the Government would have sought to impeach with the prior conviction. If, for example, the Government's case is strong, and the defendant is subject to impeachment by other means, a prosecutor might elect not to use an arguably inadmissible prior conviction.

*Id.* at ——, 105 S.Ct. at 463.

Admittedly, we have held that a defendant does not lose his right to appeal from an adverse ruling allowing impeachment by prior conviction when defendant changes his strategy and takes the stand to draw the sting by admitting the prior. *State v. Ellerson,* 125 Ariz. 249, 609 P.2d 64 (1980), and *State v. Noble,* 126 Ariz. 41, 612 P.2d 497 (1980). We stated in *Allie* however:

> Neither *Ellerson* nor *Noble* dealt with the proposition that a defendant can alter

his trial strategy *by not taking the stand* and still preserving his right to appeal. Those courts which have mistakenly relied on them for that purpose have extended the holdings past their intended meaning. *See, e.g., State v. Wilson,* 128 Ariz. 422, 626 P.2d 152 (App.1981). The intent of this court in those cases was to hold that a defendant *who takes the stand* can "draw the sting" of prior convictions without waiving his right to appeal. Thus, the rule in Arizona remains that a defendant must take the stand before he can challenge an adverse pretrial ruling allowing prior convictions to be admitted for impeachment purposes.

*State v. Allie, supra,* 147 Ariz. at 327, 710 P.2d at 437 (emphasis in original).

■ Defendant also contends the trial court erred in stating in his ruling "Indeed, I think the probative value comes from the nature of the offenses and not just that they were felonies." Defendant contends that this statement indicated the trial court believed the prior convictions were probative on the issue of guilt. We do not agree. The hearing clearly concerned the use of prior convictions *for impeachment* purposes only. We read the trial judge's statement to mean he found the convictions more probative than prejudicial on the issue of impeachment. We find no error.

## B. TRIAL MOTIONS
### GRUESOME PHOTOGRAPHS

■ Defendant claims that the trial judge erred by admitting into evidence six photographs defendant contends were gruesome and prejudicial.

We have previously stated the analysis necessary on the issue of gruesome photographs:

> [T]he correct rule is that exhibits which may tend to inflame the jury must first be found relevant. The trial court must then consider the probative value of the exhibits and determine whether it outweighs the danger of prejudice. In making this determination, the trial court must examine the purpose of the offer.

*State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983) (citations omitted).

In the instant case, all six photographs are of the victims. Exhibit 22, taken close-up, shows Debra's hand. There is a large bruise on the hand and residue of duct tape on the arm. Exhibit 24, taken close-up, focuses on the shoelace tied around Debra's neck. Exhibit 20, taken from about five feet away, shows Debra's body lying on a bed. Her face is turned away but it is obvious that there is a shoelace around her neck. Exhibit 28, taken from about eight feet away, shows Shawn's body in a desert area. His face is turned away; there is blood next to his shoulder. Exhibit 51 shows Robin's head and face. There is some residue from the duct tape, and her tongue protrudes slightly between her teeth. The photograph shows neither the wound nor any blood. Lastly, Exhibit 31 depicts a close-up of Shawn's head and face. His mouth has duct tape across it, and there is dried blood spattered across his face; however, the wound is not directly visible.

None of these photographs is particularly gruesome or inflammatory. The photographs were, however, useful for setting the scene for the jury and for explaining witnesses' testimony. They were relevant, *see* Rule 401, Ariz.R.Evid., 17A A.R.S. and had probative value. *See also State v. Thomas*, 110 Ariz. 120, 515 P.2d 865 (1973). We find no error.

## INADVERTENT MENTION OF INADMISSIBLE EVIDENCE

Defendant and Nabors stole marijuana from Snelling's trailer; marijuana was also found on defendant's person when he was arrested. However, the marijuana found on defendant was not traceable as the marijuana stolen from Guy Snelling. Thus, defendant moved, prior to trial, to preclude mention of the marijuana found on him at his arrest. The trial court agreed, ruling that such evidence would be more prejudicial than probative. Later at trial, the prosecutor asked Detective Johnson about the property taken from the defendant at arrest:

Q. Did you at that time receive any property?

A. Yes, ma'am.

Q. What property did you receive?

A. I received two paper bags of personal property which had been taken from Mr. Correll by the Las Vegas Metro Police Department, personal clothing and two ziploc plastic bags of marijuana.

Defense counsel immediately moved for mistrial, and an in-chambers discussion followed. Although the county attorney did not specifically caution the officer not to mention the marijuana, she did tell him that she would refer only to the papers, which had been removed from defendant's wallet, and his boots. Additionally, the judge noted that Officer Johnson was experienced enough to have known not to discuss inadmissible evidence (prior bad acts). Nevertheless, the trial judge took the motion under advisement and adjourned for the weekend. On Monday, 22 October 1984, the court denied defendant's motion.

▮ As a general rule, evidence that defendant committed other bad acts is not admissible to show either that defendant acted in conformity with the other bad acts, Rule 404(b), or that defendant is a "bad" person worthy of conviction. *State v. McCall*, 139 Ariz. 147, 152, 677 P.2d 920, 925 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). Other bad acts are admissible to show motive, plan, preparation or identity, to name a few; however, none of the enumerated exceptions of Rule 404(b) can be applied in the instant case. It was error to allow evidence of the marijuana to be mentioned.

▮ Although it was error for the marijuana to be mentioned, we do not believe the error was prejudicial. Admittedly volunteered testimony which indicates serious unrelated prior bad acts of a defendant that would otherwise be inadmissible can merit mistrial. *State v. Smith*, 123 Ariz. 243, 250, 599 P.2d 199, 206 (1979). How-

ever, a mistrial or reversal is required "only if it appears reasonably possible that error might have materially influenced the jury." *State v. Celaya*, 135 Ariz. 248, 256, 660 P.2d 849, 857 (1983) (citation omitted). We have stated "[a] declaration of mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983) (citation omitted). In the instant case, the trial judge held that the error was not prejudicial because the mention of marijuana was part of a larger answer; the jury's attention was not drawn to that particular part of the answer; and the court had conducted a sensitive voir dire to test the jury's feelings towards the use or possession of drugs.

We have stated that "[w]hen a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the discretion of the trial court which must evaluate the situation and decide if some remedy short of mistrial will cure the error." *State v. Adamson*, 136 Ariz. at 262, 665 P.2d 972 (citation omitted). In the instant case, the trial judge admonished the jury to disregard the last answer it had heard before the weekend break, without reminding the jury exactly what the officer said. Further, the trial judge did not give, and defense counsel did not request, a jury instruction concerning the error, presumably so as not to reemphasize the matter. "In absence of any showing of abuse of discretion, a trial court's denial of a motion for mistrial will not be disturbed on appeal." *Id.* The error did not materially influence the jury and did not merit mistrial or reversal.

## C.  SENTENCING

### THE ENMUND FINDINGS

■ Next, defendant contends that the trial court erred in making the findings required by *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983). In *Enmund v. Florida,* the

United States Supreme Court held that the Eighth Amendment does not permit the imposition of death on a defendant convicted of felony murder if he did not kill, attempt to kill, or intend that the killing would occur or that lethal force would be used. 458 U.S. at 797, 102 S.Ct. at 3376. In *State v. McDaniel, supra,* we held that "the trial judge must determine beyond a reasonable doubt prior to imposing a sentence of death that the defendant killed, attempted to kill or intended to kill. This determination, of course, must be in addition to those procedures specified in A.R.S. § 13–703." 136 Ariz. at 199, 665 P.2d at 81.

Specifically, defendant contends that the required verdict is vague and unsupported by the evidence.

In his findings, the trial judge stated:

> Defendant was convicted of first degree murder under jury instructions which allowed the jury to convict in accordance with the felony-murder rule; with respect to this, the Court finds, beyond a reasonable doubt, and with respect to the victims, in each of Counts I, II and III, respectively, that, both through his full participation with John Nabors and through his own acts, he killed and, further, that he reasonably knew that they would be killed and that he intended to kill them.

We believe that the findings are not vague merely because as defendant contends, it "lumps together" the counts. It is clear that the *Enmund* finding applied to each count. Therefore, we believe that the trial court's findings fulfill *State v. McDaniel, supra.*

■ Defendant also contends that the evidence is insufficient for the trial judge to have made an *Enmund* finding. In particular, he argues that the evidence shows that he did not personally kill Shawn D'Brito or Robin Cady and that he did not participate at all in the killing of Rosen.

In the instant case, the trial judge found that defendant killed, attempted to kill, or intended to kill each victim. The evidence does not support a finding that defendant

actually killed or attempted to kill D'Brito, Cady or Rosen. There is however evidence to support the special verdict that defendant *intended to kill* D'Brito and Cady.

Defendant helped John Nabors to bind Shawn D'Brito, Robin Cady and Guy Snelling. He helped them to the car and drove them into the desert. At the murder scene, after he believed he had killed Guy Snelling, defendant verbally encouraged Nabors in killing Robin Cady. Guy Snelling testified that after the gun had misfired, he heard defendant say, "hurry up, hurry up, ... okay, it's cool, no cars coming, get a shell chambered." The phrase " 'intended to kill' encompasses the situation where a defendant contemplated, anticipated, or intended that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." *State v. Emery,* 141 Ariz. 549, 554, 688 P.2d 175, 180 (1984) (citations omitted). The court was correct in finding that defendant "intended to kill" D'Brito and Cady.

■ Defendant also argues that the *Enmund* finding as to Debra Rosen is unsupported by the evidence. We agree. The facts indicate that Nabors dragged Rosen into a bedroom after her hands and ankles had been bound with duct tape. This was the last time Snelling saw her alive. After defendant and Nabors had loaded Snelling and the other two victims into the car, Nabors told defendant he was going back into the trailer and secure the taping on Rosen. Nabors was in the trailer for about five minutes. Nabors was the last person known to be with Debra Rosen.

We believe that the evidence does not support a finding beyond a reasonable doubt that defendant intended to kill Debra Rosen. Hence, as to the murder of Debra Rosen, we modify the sentence from death to life imprisonment.

### AGGRAVATING CIRCUMSTANCES

Defendant contends that neither the evidence nor case law supports a finding of the aggravating circumstances of A.R.S. § 13–703(F)(2) previous violent felony, (5)

receipt or expectation of pecuniary value, and (6) especially heinous, cruel or depraved. According to *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1976), this court must independently review the record to determine the presence or absence of both aggravating and mitigating circumstances.

■ First, defendant argues that the trial court erred in finding that defendant had previously been convicted of a felony involving the use or threat of violence against another person. A.R.S. § 13–703(F)(2). The facts indicate that at sentencing defendant's California parole agent testified that defendant was on parole for robbery. Additionally, the state introduced a certified document of defendant's convictions. This certified document indicates defendant had been convicted on three counts of robbery, California Penal Code § 211, and on one of these counts he had received an enhanced sentence based on Penal Code § 12022.5, which provides that a sentence will be enhanced if it is found that defendant used a firearm in the commission of a felony. Therefore, the certified record indicates defendant committed a robbery and used a firearm during its commission.

The relevant California statutes provide:
§ 211. Definition

ROBBERY DEFINED. Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

§ 212.

The fear mentioned in Section 211 may be either:

1. The fear of an *unlawful injury to* the person or *property of the person* robbed, or of any relative of his or member of his family; or,

·2. The fear of an immediate and *unlawful injury to* the person or *property* of anyone in the company of the person robbed at the time of the robbery.

West's Ann.Penal Code §§ 211, 212 (emphasis added).

On appeal, defendant emphasizes that A.R.S. § 13–703(F)(2) requires the felonious violence to be directed *against another person.* Defendant hypothesizes that under the California Penal Code a person could commit robbery with the threat of violence against the property of the victim but without the use or threat of violence directed to the victim. This contention, ingenious as it is, is only *theoretically* possible. As a practical matter "armed" robbery against the property of a victim does not occur without use or threat of violence against the person as well. Such an act by an armed person would also be a threat of violence against the victim himself within the meaning of A.R.S. § 13–703(F)(2). We find that the trial judge did not err in finding that defendant had a prior felony conviction involving use or threat of violence against another person.

█ Second, defendant contends that the evidence does not support a finding that he committed the murders for pecuniary gain. Specifically, he argues that the expectation of pecuniary gain was not the cause of the murders. We do not agree.

We have held that A.R.S. § 13–703(F)(5) does not apply whenever a person has been killed and at the same time defendant has made a financial gain. *State v. Hensley,* 142 Ariz. 598, 603, 691 P.2d 689, 694 (1984). "In other words, the hope of pecuniary gain must provide the impetus for the murder." *Id.* (quoting *State v. Harding,* 137 Ariz. 278, 296–297, 670 P.2d 383, 394–395 (1983) (Gordon, J. specially concurring), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). Factors to be considered in making this determination are whether the murder was part of a larger scheme or was instead unexpected or accidental. *See State v. Hensley,* 142 Ariz. at 604, 691 P.2d at 695. Despite this discussion, we found in *Hensley* that the murders in that case had been committed in expectation of pecuniary gain.

In the instant case, the murders were a part of the overall scheme of the robbery with the specific purpose to facilitate the robbers escape. The defendant had the three victims lie on the floor during the robbery and before leaving the bar shot each victim in turn with the intent that no witnesses be left to identify the robbers. *Id.*

The facts in the instant case are similar to those in *Hensley.* The murders of D'Brito and Cady were neither accidental nor unexpected. Defendant and Nabors very carefully executed the armed robbery, and the murders were part of the scheme of robbery. The only motivation for the killings was to leave no witnesses to the robbery. *See State v. Libberton,* 141 Ariz. 132, 685 P.2d 1284 (1984) (defendant wanted victim's car and money to evade capture and killed victim to hinder detection).

In contrast, *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983), is distinguishable from the instant case. In *Gillies,* the defendant and his friend repeatedly raped the victim, stole her money and credit cards, then brutally murdered her. Although money and items were taken, this court found that the murder was not committed for pecuniary gain. Gillies' stated purpose for the murder was to eliminate the victim as a witness to her own rape. *Id.* at 512, 662 P.2d at 1019. His primary motivation had been the rape and only secondarily did robbery enter the picture.

In the instant case, accomplishing the robbery was defendant's primary motivation and the murders were directly connected to the robbery. Therefore, we find the trial judge did not err in finding the murders were committed for pecuniary gain.

█ Third, the trial judge found that defendant committed the murders in a cruel, heinous, and depraved manner. A.R.S. § 13–703(F)(6). Defendant, however, argues that this finding is erroneous.

We have defined the terms cruel, heinous, and depraved in *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1 (1983), *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Basically, "cruelty

involves the pain and distress visited upon the victims, and that heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *Id.* at 51, 659 P.2d at 10 (citations omitted). The statutory expression is in the disjunctive. *State v. Carriger,* 143 Ariz. 142, 160, 692 P.2d 991, 1009 (1984). Hence, if we find the presence of any one of these factors, we can uphold the aggravating circumstance of A.R.S. § 13-703(F)(6). We will consider each circumstance separately.

Cruelty has been defined as involving the infliction of pain, especially in a wanton, insensitive or vindictive manner. *State v. Gretzler,* 135 Ariz. at 51, 659 P.2d at 10. Cruelty can involve mental as well as physical suffering. A victim's uncertainty as to the ultimate fate can be significant in indicating mental suffering. In *Gillies II,* we said, "[i]t is equally clear that a victim who, like Suzanne Rossetti, is kept uncertain as to his or her fate, also suffers. These victims are to be contrasted with the individual who is killed instantly without knowing what happened." 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984) *cert. denied,* — U.S. ——, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). *See* also *State v. Gretzler,* 135 Ariz. at 53, 659 P.2d at 12. In *State v. (Ricky Wayne) Tison,* we quoted with approval the trial judge's discussion of the facts indicating cruelty:

> [A]ll the victims were moved from the highway under force and, ... very probably at gun point. Necessarily John Lyons, Donnelda Lyons and Theresa Tyson ... must have become apprehensive about their welfare and ... ultimately about all their lives before the fatal shots were fired. The stress and fear each must have initially experienced had to have grown to immense, almost unimaginable proportions before they were murdered.

129 Ariz. 526, 543, 633 P.2d 335, 352 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

In *State v. McCall,* we also upheld circumstances that indicated the infliction of mental distress.

> The Redmonds and Mrs. Phelps were herded about the Redmond home at gunpoint by three men. After giving up their valuables, they were forced to lie down on a bed, had their hands taped behind their back, and were gagged with socks. They knew that their captors were armed. It may be inferred that they were uncertain as to their ultimate fate.

139 Ariz. 147, 161, 677 P.2d 920, 934 (1983) (citation omitted).

Additionally, where a victim witnesses the murder of another victim and then undoubtedly realizes that soon he also will be murdered, this court has upheld a finding of cruelty due to mental suffering. *Tison, McCall,* and *Gretzler* present this fact pattern. In *McCall, supra,* we characterized the victim's emotion as "unimaginable terror" to have a loved one shot to death within hearing and then to wait for his turn to come. 139 Ariz. at 161, 677 P.2d at 934. In *Tison, supra,* we found reasonable the trial judge's characterization that "[t]he emotions certainly experienced by John Lyons, Donnelda Lyons and Theresa Tyson in those last minutes of their lives were the equivalent of the severest physical torture." 129 Ariz. at 543, 633 P.2d at 352.

The instant case compares equally with *Tison, McCall, Gillies,* and *Gretzler* on the issue of cruelty. Snelling, Cady and D'Brito must have been in great fear about their ultimate fate. Nabors had a gun, which he often lent to defendant, and additionally, defendant armed himself with a kitchen knife. Each victim was bound with duct tape, and this occurrence must have caused each victim great distress. This fear and worry must have greatly increased when they were loaded into Cady's car and driven into the desert. At no time could they be certain what these two armed men intended beyond robbery. In the desert, each victim was laid on the ground. Snelling was shot first, D'Brito was second, and then Cady was shot last. Therefore, Cady

and D'Brito both witnessed the shooting of Snelling and must have realized they would be next. Cady further suffered because the gun misfired a couple of times before Nabors succeeded in killing her. Hence, we find defendant committed the murders of Cady and D'Brito cruelly.

We next turn to the issues of heinousness and depravity. In *Gretzler*, we listed five factors that indicate heinousness and depravity: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim beyond the murderous act itself; (3) mutilation of the victim's body; (4) the senselessness of the crime; and (5) the helplessness of the victim. 135 Ariz. at 52, 659 P.2d at 11. Absent additional factors neither of these last two factors alone will ordinarily lead to a finding of heinousness or depravity. *State v. (Bernard) Smith*, 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985); *State v. Gretzler*, 135 Ariz. at 52–53, 659 P.2d at 11–12. In addition to the five factors presented in *Gretzler*, we have also found that depravity is indicated where defendant admitted he committed the murder to prevent the victim from testifying against him concerning a felony that occurred contemporaneously with the murder. *See State v. (Roger Lynn) Smith*, 141 Ariz. 510, 511–512, 687 P.2d 1265, 1266–1267 (1984); *State v. Hensley, supra*.

We do not find any evidence that indicates defendant relished the murders, inflicted gratuitous violence on the victims, or mutilated the victim's bodies. However, depravity is indicated from several other factors. In the instant case, depravity is indicated by the senselessness of the murders in that the murders were unnecessary to accomplish the robbery. *See State v. Zaragoza*, 135 Ariz. 63, 69, 659 P.2d 22, 28 (1983). Depravity is also shown by the helplessness of the victims. The victims were bound and gagged; defendant and Nabors took advantage of the fact that the victims could not resist and killed them one by one. Finally, depravity is indicated by a total disregard for human life. *See State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897 (1980). We have said "[e]nding the life of a human being so that that person cannot testify against the defendant indicates a complete lack of understanding of the value of a human life." *State v. Smith*, 141 Ariz. at 512, 687 P.2d at 1267. In the instant case, a total disregard for human life is clearly shown in the record. The only reasonably ascertainable motive for the murders was to cold-bloodedly eliminate any and all witness to the robbery.

We agree with the trial judge that the murders were committed in a cruel, heinous, and depraved manner.

## EX POST FACTO

Defendant also complains that the aggravating circumstance of A.R.S. § 13–703(F)(8) should not have been applied because the crime occurred before the effective date of the amendment that added subsection (8) to § 13–703(F). The amendment provided as an additional aggravating circumstance that "the defendant has been convicted of one or more other homicides as defined in § 13–1101, which were committed during the commission of the offense". A.R.S. § 13–703(F)(8). In particular, defendant argues that the retroactive application of this factor violates the *ex post facto* clause.

Both the federal and Arizona Constitutions prohibit *ex post facto* laws. U.S. Const. art. 1, § 10, Ariz. Const. art. 2, § 25. The prohibition on *ex post facto* laws forbids a state from enacting a law " 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed' ". *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981) (quoting *Cummings v. Missouri*, 4 Wall. (71 U.S.) 277, 325–326, 18 L.Ed. 356 (1867)). The rationale behind the prohibition is to "give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Id.* at 28–29, 101 S.Ct. at 964 (citations omitted). A law is *ex post facto* when it is applied to events occurring before enactment and when it disadvantages the of-

fender affected by it. *Id.* If, however, the change is procedural, even if disadvantageous, it is not *ex post facto. Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344, 357 (1977).

█ In the instant case, we find that the trial judge applied the new aggravating circumstance to murders which occurred before the effective date of this aggravating circumstance and that the amendment is a substantive, rather than a procedural, change. *See Dobbert v. Florida, supra.* We also find that defendant obviously could be disadvantaged. Application of this amendment to defendant would therefore be an *ex post facto* law. *See State v. Jordan,* 440 So.2d 716 (La.1983). Thus, the retroactive application of this aggravating circumstance cannot be constitutionally upheld.

## MITIGATION

The trial court found no mitigating circumstances which called for leniency. Defendant offered five mitigating circumstances: upbringing, cooperation in preparation of the pre-sentence report, psychological problems such that he did not understand the wrongfulness of his conduct, his minor participation in the murders, and age. A.R.S. § 13–703(G) provides that any relevant mitigating circumstance proffered must be considered in determining whether to impose the death penalty. We find that none of these factors, alone or in combination, are sufficiently substantial to call for leniency.

First, defendant alleges that his family relationship was not a close one and that his parents were very strict and often used corporal discipline. At fourteen he was told he must either join the church or leave; defendant chose to leave whereupon he immediately became involved in minor crimes. We do not feel that this alone is sufficiently substantial to call for leniency.

Second, defendant claims that his cooperation in the preparation of the pre-sentence report calls for leniency. We do not agree. It is in defendant's interest to cooperate at

sentencing; defendant should not be rewarded for self-serving acts.

Third, defendant claims that his psychological problems prevented him from understanding the wrongfulness of his conduct. According to defendant, he received psychological therapy as a teenager for emotional depression, explosive anger, and violent behavior. Other than these statements defendant has offered no evidence or expert testimony on which we could base a finding that he was unable to appreciate the wrongfulness of his conduct. Uncorroborated, these statements do not present sufficient evidence to indicate his capacity was impaired.

Fourth, defendant claims his participation in the murders was so minor as to warrant leniency. We do not agree. We have found that defendant intended that Cady and D'Brito be killed. For reasons stated in our *Enmund* review we hold that defendant played a major role in the murders of D'Brito and Cady, even though he did not do the actual killing.

█ Lastly, defendant claims his age, 24, warrants leniency. Age alone does not always require leniency. *State v. Gillies,* 135 Ariz. at 513, 662 P.2d at 1020. When age is offered as a mitigating factor, its weight may be discounted by the extent and duration of defendant's participation. *See State v. Gillies II,* 142 Ariz. at 571, 691 P.2d at 662.

In *State v. Valencia,* we found that defendant's age of 16 was sufficiently substantial to call for life imprisonment despite the presence of aggravating factors under A.R.S. § 13–703(F)(1) & (2). 132 Ariz. 248, 250–251, 645 P.2d 239, 241–242 (1982). On the other hand, in *Gillies II* we held that defendant's age of 20 was not sufficiently substantial given the extent and duration of his participation. 142 Ariz. at 571, 691 P.2d at 662.

In the instant case, we find no evidence in the record to indicate defendant was an immature 24 year old. His age is discounted by the extent and duration of his participation in the murders. Thus, we do not

find age sufficient alone to call for leniency.

We have found three aggravating circumstances of A.R.S. § 13–703(F)(2), (5), and (6). We have also considered the mitigating circumstances offered by defendant, and we conclude that even in combination the mitigating circumstances are not sufficiently substantial to call for leniency.

### VAGUE SPECIAL VERDICT

Defendant also challenges the special verdict as being vague because the trial judge should have discussed the aggravating and mitigating factors as they applied to each count.

In the instant case, Count I related to the murder of Debra Rosen, Count II to the murder of Robin Cady, and Count III to the murder of Shawn D'Brito. These counts were properly joined, Ariz.R.Crim.P., Rule 13.3, 17 A.R.S., and the jury returned separate verdicts on Counts I, II, and III. Ariz. R.Crim.P., Rule 23.2, 17 A.R.S.. In a special verdict, the trial judge set forth his findings as to the existence or non-existence of each of the aggravating and mitigating factors. A.R.S. § 13–703(D); *State v. Leslie*, 147 Ariz. 38, 708 P.2d 719 (1985). The trial judge found the existence of the aggravating factors provided in §§ 13–703(F)(2), (5), (6), and (8) and that the other aggravating factors of § 13–703(F) did not exist. (At the time of sentencing, A.R.S. § 13–703(F)(9) had not yet been adopted). The trial judge then found that no mitigating factors existed which called for leniency. Further, he explained this finding as it applied to each mitigating factor urged by the defendant.

We find no merit in defendant's contention that the special verdict is vague. Each of the aggravating and mitigating factors in § 13–703, except (F)(6) (heinous, cruel or depraved), can apply to a case where the joined counts involve different victims because all of the factors except (F)(6) focus on the defendant, not the individual victim. Only A.R.S. § 13–703(F)(6) focuses on the victim. It questions whether the offense was committed in a cruel, heinous, or depraved manner. In determining whether the crime was committed cruelly, the court looks to the suffering of the victim. *State v. Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. In the instant case, the trial judge said: "[d]efendant committed *each* of the three murders in Count I, II, III in an especially heinous, cruel and depraved manner." (emphasis added). We find that the trial judge stated sufficiently for the record his finding of cruel, heinous and depraved applied separately to each victim.

### CONSTITUTIONALITY OF ARIZONA'S DEATH PENALTY STATUTE

Defendant attacks A.R.S. § 13–703 on various constitutional grounds. First, defendant claims that A.R.S. § 13–703 results in an unconstitutional mandatory death sentence where one aggravating and no mitigating circumstances are found. We have upheld the constitutionality of the death penalty statute on this issue in *State v. Gillies*, 142 Ariz. at 568, 691 P.2d at 659. "A balance must be struck between mandatory sentencing procedures on the one hand and unbridled judicial discretion on the other. We cannot say that A.R.S. § 13–703 strikes this balance in an unconstitutional fashion." *Id. See* also *State v. Jordan*, 137 Ariz. 504, 508, 672 P.2d 169, 173 (1983).

Next, defendant attacks the death penalty statute because it does not require the prosecutor to prove the nonexistence of mitigating circumstances. We have previously held that "[t]he burden of mitigation has consistently been placed on the defendant, ..." *State v. Smith*, 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980) (citations omitted). *See* also *State v. Gillies*, 142 Ariz. at 568–69, 691 P.2d at 689–90; *State v. Greenawalt*, 128 Ariz. 150, 175, 624 P.2d 828, 853 (1981), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

Third, defendant claims that the constitution gives him the right to have a jury decide whether aggravating and mitigating factors exist and whether defendant should receive the death penalty. The U.S. Supreme Court has recently held that the U.S.

Constitution does not require the death penalty be imposed by a jury in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). We also have held that defendant has no right to have a jury impose the death penalty. *State v. Gillies,* 142 Ariz. at 568, 691 P.2d at 659, or to have a jury find the aggravating and mitigating factors, *State v. Libberton,* 141 Ariz. at 137, 685 P.2d at 1289. Therefore, we find this attack meritless.

Fourth, defendant complains that the death penalty statute is unconstitutional because it does not provide adequate standards to be used in balancing the aggravating against the mitigating factors. We have previously rejected this argument. *See State v. Gillies,* 142 Ariz. at 568, 691 P.2d at 659; *State v. Libberton,* 141 Ariz. at 137, 685 P.2d at 1289; *State v. Gretzler,* 135 Ariz. at 53–56, 659 P.2d at 12–15 (1983).

Last, defendant attacks the constitutionality of the death penalty statute because it fails to require the state to prove beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. "In *Proffitt v. Florida,* [428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)], the Supreme Court validated a statute that did not require a jury to find beyond a reasonable doubt that aggravating circumstances outweighed mitigating circumstances. We continue to believe that our statute provides constitutionally acceptable standards for deciding whether aggravating circumstances outweigh mitigating factors." *State v. Nash,* 143 Ariz. 392, 401, 694 P.2d 222, 231 (1985) (citation omitted).

Despite these attacks on Arizona's death penalty statute, we continue to hold that it is constitutional.

## PROPORTIONALITY REVIEW

In death penalty cases we must conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases." *State v. Bracy,* 145 Ariz. 520, 538, 703 P.2d 464, 482 (1985) (quoting *State v. Nash,* 143 Ariz. 392, 406,

694 P.2d 222, 236 (1985)). *See also State v. Richmond,* 114 Ariz. at 197, 560 P.2d at 52.

We have therefore reviewed the circumstances of other Arizona death-row inmates whose sentences have been upheld as proportional. There are no cases similar to the instant case on every factual point. Indeed, almost all of Arizona's death-row inmates actually killed their victims. However, in a few death penalty cases, the murder involved more than one person. The common scenario, in these cases, has one defendant denying that he committed the murder and claiming that an accomplice-defendant actually killed the victim. *See State v. Gillies I, supra; State v. Gillies II, supra.*

In *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983), we discussed two cases where the death sentences were reduced to life in part because uncontroverted evidence indicated the defendant did not actually murder the victim. In the first case, *State v. Encinas,* 132 Ariz. 493, 647 P.2d 624 (1982), the defendant and another accomplice helped to hold the victim down on the road while a third accomplice drove over him with a car. These two accomplices then stabbed the victim thirty to forty times. In mitigation of the death sentence, "the court found Encinas' age, 18, that his participation in the crime was less than his accomplices', no prior criminal record, and a showing of génuine remorse, coupled with favorable recommendations by probation officers." *State v. Gillies,* 135 Ariz. at 515–516, 662 P.2d at 1022–1023. Encinas was sentenced to life imprisonment. In the second case, *State v. Mata,* 125 Ariz. 233, 609 P.2d 48 (1980), *cert. denied,* 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980), two brothers, Alonzo and Luis, raped and beat the victim. They took her by car to a riverside where Luis killed her. Alonzo offered in mitigation that he was not the actual killer, was an "inexperienced" eighteen year-old, had no prior criminal record and was cooperative with the police. Alonzo received life imprisonment while Luis received the death penalty. *State v. Gillies,* 135 Ariz. at 516, 662 P.2d at 1023.

The instant case has in common with *Encinas* and *Mata* the fact that defendant did not commit the actual killings. *See State v. Gillies, supra,* where it was questionable whether defendant or accomplice actually killed the victim. However, the instant case has an important difference from *Encinas* and *Mata.* In *Encinas* and *Mata* their sentences were reduced to life because of mitigating circumstances in addition to the fact that they did not actually kill the victim. As we have noted above, the instant case presents no sufficient mitigating circumstances calling for leniency.

We find the instant case comparable to State v. (Ricky Wayne) Tison, in which we implicitly upheld the proportionality of his death penalty. *(Ricky Wayne) Tison II,* 142 Ariz. 446, 450, 690 P.2d 747, 751 (1984). In *Tison I,* Ricky Wayne argued that his "participation in the murders was relatively minor and that he should not be sentenced to death since he did not specifically intend the victims' deaths", 129 Ariz. at 545, 633 P.2d at 354. Neither the trial court nor this court accepted that argument. Although Ricky and Raymond Tison did not specifically intend the deaths, did not plot in advance that the deaths occur and did not actually pull the triggers, these facts were considered "of little importance." The Tison brothers associated themselves with known killers and assisted these killers in further murders. "As a minimum, the Tison brothers stood by, armed with guns, while their companions slaughtered the Lyonses and Theresa Tyson." *Id.*

Here, as in *Tison,* defendant did everything but actually kill Cady and D'Brito. He held a gun on the victims, helped bind and transport them, and finally verbally encouraged Nabors to commit the murders.

In addition, we have noted:

The legislature has made it clear that the death penalty is not to be imposed in every case of first degree murder. The death penalty is reserved for those cases where the manner in which the crime was committed raises it above the norm of first degree murders, or the background of the defendant places the defendant above the norm of first degree murders. Usually, a murder which is cruel, heinous or depraved, as defined by our cases, will raise a crime above the norm of first degree murders, and a defendant with a prior record of serious criminal activity or crimes involving violence to others indicates that the defendant is above the norm of first degree murderers.

*State v. Blazak,* 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982), *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982).

In the instant case, we have found the murders were committed in a cruel, heinous, and depraved manner, A.R.S. § 13–703(F)(6), and for pecuniary gain, A.R.S. § 13–703(F)(5). We find that these crimes were above the norm of first degree murders and that defendant, because of his prior convictions for crimes involving violence, is above the norm of first degree murderers. Therefore, we uphold the proportionality of the death penalty in the instant case.

We have searched the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. McGann,* 132 Ariz. 296, 645 P.2d 811 (1982). We find none.

The convictions and judgments are affirmed. The sentences are also affirmed, except the sentence on Count I which is reduced to life imprisonment.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.