912 P.2d 1281

**STATE of Arizona, Appellee,**

v.

**Thomas Arnold KEMP, Jr., Appellant.**

No. CR–93–0332–AP.

Supreme Court of Arizona,
En Banc.

Feb. 29, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Gregory A. McCarthy, Assistant Attorney General, Phoenix, for State.

Susan A. Kettlewell, Pima County Public Defender by Rebecca A. McLean, Kristine Maish, John F. Palumbo, Nancy Follin Jones, Deputy Public Defenders, Tucson, for Thomas Arnold Kemp, Jr.

## OPINION

MARTONE, Justice.

Kemp was found guilty of first degree felony murder, armed robbery, and kidnapping. He received a death sentence for the murder and prison terms for the other offenses. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz.R.Crim. P., and direct under A.R.S. § 13–4031. We affirm his convictions and sentences.

## I. FACTS AND PROCEDURE

On July 11, 1992, at approximately 11:15 p.m., Hector Juarez awoke when his fiancee, Jamie, returned home from work to their shared unit at the Promontory Apartments in Tucson. A short time later, Juarez left to get something to eat. Jamie assumed he went to a nearby Jack-in-the-Box at the corner of Oracle and River Roads. He never returned.

At around midnight, Jamie became concerned that Juarez had not come home and began to look for him. She found both her car and his car in the parking lot. Her car, the one Juarez was driving, was unlocked, smelled of fast food, and had insurance papers on the roof. After checking with Juarez's brother and a friend, Jamie called the police.

Two or three days before Juarez was abducted, Jeffery Logan, an escapee from a California honor farm, arrived in Tucson and met with Thomas Kemp. On Friday, July 10, Logan went with Kemp to a pawn shop and helped him buy a .380 semi-automatic handgun. Kemp and Logan spent the next night driving around Tucson. At some time between 11:15 p.m. and midnight, Kemp and Logan abducted Juarez from the parking area of his complex.

At midnight, Kemp used Juarez's ATM card and successfully withdrew approximately $200. He then drove Juarez out to the Siverbell Mine area near Marana. Kemp walked Juarez 50 to 70 feet from the truck, forced him to disrobe, and shot him in the head twice.

Kemp then made two unsuccessful attempts to use Juarez's ATM card in Tucson. The ATM machine kept the card after the second time. Kemp and Logan painted Kemp's truck, drove to Flagstaff, and sold it. They bought another .380 semi-automatic handgun with the proceeds.

While in Flagstaff, Kemp and Logan met a couple travelling from California to Kansas. At some point they kidnapped the couple and forced them to drive to Durango, Colorado, where Kemp forced the man to disrobe. He then sexually assaulted him.

Later, Kemp, Logan, and the couple drove to Denver. Two weeks after Juarez was abducted, the couple escaped. For reasons unclear of record, Logan left Kemp, contacted the Tucson police about the murder of Juarez, and was arrested in Denver.

With Logan's help, the police discovered Juarez's body. Later that day, the police arrested Kemp at a homeless shelter in Tucson. He was carrying the handgun purchased in Flagstaff and a pair of handcuffs. After having been read his *Miranda* rights, Kemp answered some questions before he asked for a lawyer. Kemp admitted that he purchased a handgun with Logan on July 10. He said that on the day of the abduction and homicide he was "cruising" though apartment complexes, and that there was a very good possibility he was at the Promontory Apartments. When the police confronted him with the ATM photographs, he initially denied being the man in the picture. After having been told Logan was in custody, and having again been shown the photographs, Kemp said "I guess my life is over now."

While awaiting trial, Kemp on two separate occasions made admissions to corrections officials. He said that he was in protective custody because the person he killed was Hispanic; the Hispanics in the jail were after him because they thought the crime was racially motivated; and the whites would not protect him.

Logan's and Kemp's trials were severed. Logan was tried first, convicted, and sentenced to life imprisonment for the murder. A jury found Kemp guilty on all counts. The court found three statutory aggravating factors: a prior conviction of a felony involving the use or threat of violence against a person, the murder was committed with the expectation of pecuniary gain, and the murder was committed in an especially heinous, cruel or depraved manner. The court did not find any mitigating circumstances and sentenced Kemp to death.

## II. ISSUES PRESENTED

Kemp raises the following issues:

### A. *Trial Issues*

1. Did the trial court err in admitting admissions made by Kemp to jail officials?

2. Was evidence of the subsequent homosexual assault erroneously admitted?

3. Were hearsay statements made by Logan erroneously admitted?

4. Did the prosecutor comment on Kemp's invocation of his *Miranda* rights?

5. Should the trial court have granted Kemp's Rule 20 motion for judgment of acquittal?

6. Did prosecutorial misconduct deprive Kemp of a fair trial?

7. Did the trial court err in not granting Kemp's motion for change of venue?

8. Did the trial court err in impaneling the jury?

B. *Sentencing Issues*

1. Is the *Enmund* finding proper?

2. Does Kemp's California robbery conviction qualify as an offense involving the use or threat of violence against a person (A.R.S. § 13–703(F)(2))?

3. Was the killing committed in an especially cruel manner (A.R.S. § 13–703(F)(6))?

4. Is the finding that Kemp murdered the victim in expectation of pecuniary gain proper and is this aggravating factor constitutional (A.R.S. § 13–703(F)(5))?

5. Did the trial court err in failing to find any mitigating factors and was Kemp's mitigation properly balanced against the aggravating factors?

6. Did the trial judge improperly rely on the presentence report in sentencing Kemp to death?

7. Should Kemp's death sentence be vacated as part of this Court's independent review?

8. Should this Court conduct a proportionality review?

9. Did the trial court err in not ordering a competency hearing?

C. *Issues waived at trial*

Kemp raises the following issues that were not preserved in the trial court. The issues therefore are waived. Furthermore, there was no fundamental error.

1. Did the trial court grant an overbroad limiting instruction guiding the jury's consideration of evidence that Kemp committed a subsequent homosexual assault?

2. Did the trial court err by not, *sua sponte*, instructing the jury on lesser included offenses to armed robbery and kidnapping? (Because there is no evidence in the record to support giving the instruction, there is no error. Kemp's defense was that Logan was the killer.)

3. Did the trial court err in admitting unduly prejudicial photographs of Juarez's body? (Kemp stipulated to the introduction of the photographs.)

D. *Issues waived for failure to argue on appeal*

■ Kemp raises 12 issues in the appendix to his opening brief. Argument, however, must be in the body of the brief. *State v. Walden*, 183 Ariz. 595, 605, 905 P.2d 974, 984 (1995). We therefore strike the text contained in the appendix of Kemp's opening brief. All of these issues, which we list in our Appendix, are waived. Counsel, to avoid preclusion, must briefly argue the issue in the body of the brief. *Id.* As we said in Walden, "[a] list of issues in the brief is not adequate. Nor may the argument be in the appendix." *Id.*

## III. DISCUSSION

### A. *Trial Issues*

#### 1. *Kemp's Admissions to Jail Officials*

Kemp admitted guilt to two jail officials. He made one comment to Officer Compton after having been asked why he was in administrative segregation or protective custody. Compton testified that Kemp said: "the guy killed was Hispanic and the Hispanic guys in the pod where he had previously been felt it was racially motivated. He says white guys can't help me so I have to be put

in protective custody status so they couldn't get at him." Transcript of June 3, 1993, at 18. (At the motion to suppress hearing held out of the presence of the jury, Compton testified that Kemp said "the guy I killed was Hispanic." Transcript of June 2, 1993, at 159.)

Officer Jackson testified that Kemp, in the course of a routine conversation, made a similar statement. Kemp said: "the guy I killed was a Mexican, the Mexicans in the pod I was in are after me. That is why I requested to be moved back here, for my own protection." Transcript of June 3, 1993, at 33.

Kemp argues that these statements were involuntarily made in violation of the Fifth Amendment to the United States Constitution and art. 2, § 10 of the Arizona Constitution. He also argues that they were deliberately elicited by the jail officials in violation of his Fifth Amendment *Miranda* rights and his Sixth Amendment *Massiah* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

■ The trial judge's finding that the statements were voluntary was not clearly and manifestly wrong. *See State v. Scott*, 177 Ariz. 131, 136, 865 P.2d 792, 797 (1993). The record supports the finding that the corrections officials were not attempting to overcome Kemp's will to induce him to inculpate himself. While Jackson and Compton testified that inmates generally had to respond to their inquiries, their questions concerned only the "day to day" circumstances of his incarceration. Kemp was not obligated to make these admissions. *Cf. Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (noting that inquiries between the accused and the State "relating to routine incidents of the custodial relationship[ ] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards* [*v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding that a request for a lawyer requires the police to cease questioning until the accused consults with his or her lawyer unless the defendant initiates further conversation) ].").

■ Kemp argues that *Miranda* requires the exclusion of the statements because he had previously asserted his right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 101 S Ct. 1880, 68 L.Ed.2d 378 (1981). But *Miranda* only applies to custodial interrogation. Jackson and Compton did not attempt to elicit an incriminating response from Kemp. *See Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (holding that a comment made by one police officer to another, in the presence of the accused, expressing concern that handicapped children might come across a shotgun, is not a statement designed to elicit an incriminating response).

■ Compton only asked Kemp why he was in protective custody. He did not interrogate him. Routine inquiries by guards concerning the security status of prisoners are not statements designed to elicit an incriminating response. *Id.* Compton's question was reasonable and relevant to maintaining order in the prison and protecting Kemp. Similarly, Kemp's statements to Jackson were the product of ordinary, everyday interaction between guard and prisoner. Because Kemp was not interrogated by Compton and Jackson, the admission of his statements did not violate *Miranda* and his rights under art. 2, § 24 of the Arizona Constitution.

Kemp's assertion that his Sixth Amendment *Massiah* rights were violated fails for the same reason his *Miranda* claim fails: the guards did not seek to elicit incriminating evidence from him. *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986) (holding that "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"). Kemp's admissions therefore were properly admitted.

## 2. *Subsequent Homosexual Assault*

Kemp claims that the admission of evidence that he sexually assaulted the man he abducted after selling his truck in Flagstaff unfairly prejudiced his defense and requires reversal. The victim testified that while alone with Kemp in a hotel room, Kemp forced him to undress and then touched his genitals. At trial, the State sought to introduce evidence of the kidnapping, robberies, and sexual assault committed by Kemp and Logan after the murder of Juarez and during the flight from Tucson. The trial court granted Kemp's motion in limine to exclude all of the criminal acts except the sexual assault.

We agree that the trial court erred. All of the kidnapping and robbery evidence should have been admitted as evidence of flight showing consciousness of guilt. *See* M. Udall & J. Livermore, *Law of Evidence* § 125, at 258 (3d ed. 1991). The sexual assault is more problematic. At trial, the State offered the sexual assault evidence to establish motive for the abduction of Juarez and to prove the identity of the person who killed him. On appeal, the State abandoned this rationale and argued that the evidence would have been properly admitted to show a common plan or scheme. Rule 404(b), Ariz. R.Evid.

We need not consider the new theory, because even if there was error, it was harmless beyond a reasonable doubt. Kemp's conviction is supported by overwhelming evidence of his guilt, including his own statements to the police and corrections officials. After viewing the record in its entirety, we find beyond a reasonable doubt that the jury would have reached the same verdict if the evidence had been excluded.

Kemp also argues that the prosecutor did not timely disclose that the subsequent homosexual assault would be used against him. Before trial, the court on two occasions ordered the State to disclose the bad acts it would use. *See* Rule 15.1(a)(6), Ariz. R.Crim.P. The State did disclose the victim of the subsequent homosexual assault as a possible witness approximately six months before trial. While it never provided Kemp with a list of his bad acts, Rule 15.1(a)(6) appears to apply to prior acts and not subsequent conduct. But even if Rule 15.1(a)(6) applies here, there simply was no prejudice.

Discovery rulings are affirmed unless there is an abuse of discretion. *See State v. Krone,* 182 Ariz. 319, 321, 897 P.2d 621, 624 (1995). Kemp argues that he was unable to obtain a fair and impartial jury and he was unable to develop any impeachment or motive evidence against the victim of the subsequent homosexual assault. We disagree.

First, the record is clear that Kemp's trial counsel was aware that Kemp's homosexuality potentially would be placed before the jury. Logan's statements to the police and media raised the issue. In addition, Logan's trial preceded Kemp's, and the witness Kemp sought to preclude testified regarding the same events at Logan's trial. Furthermore, Kemp successfully suppressed other evidence of his homosexuality, including sexually explicit photographs and a journal purportedly detailing his homosexual encounters. Although Kemp did not have a ruling regarding the bad act evidence prior to voir dire, he was clearly aware of the issue, was not surprised, and could have developed it at voir dire if he so wanted.

Second, Kemp's argument that he was unable to develop impeachment or motive evidence is without merit. The only connection the witness had to Kemp was the misfortune of being his kidnapping, robbery, and sexual assault victim. The witness was listed approximately six months before Kemp's trial and testified about the same events at Logan's trial. There was no abuse of discretion.

## 3. *Logan's Hearsay Statements*

Kemp claims the court erred in admitting evidence that Logan made statements to the police about the murder. Before trial, and after Kemp's and Logan's trial was severed,

Kemp filed a motion to preclude Logan's hearsay statements. Apparently, the motion was not ruled upon. At trial, after the judge ruled that defense counsel had opened the door to their admission, the police detective who had interrogated both Logan and Kemp was permitted to testify to some of the statements made by Logan.

On direct examination during the State's case-in-chief, the police detective testified that he questioned Kemp after his arrest and that Kemp agreed to answer some of his questions. Through the police detective, some of Kemp's admissions concerning his activities and association with Logan before the murder were admitted.

On cross-examination, defense counsel elicited answers that all of the physical evidence, with the exception of the "fuzzy" ATM photograph, implicated Logan but not Kemp. He then went on to ask:

Q: There is *no evidence* that Kemp had possession of the gun that killed Hector [Juarez] at any time after the purchase?

A: No.

Q: And in fact, the *only evidence* you have got of what happened to that gun is it was used to kill Hector and Jeff Logan had it; *no evidence* Thomas Kemp was in the Siverbell Mines area that night, is there?

A: No.

Q: There is *no evidence* that Thomas Kemp knew?

A: No.

Q: There is *no evidence* that Thomas Kemp was at the scene where the body was found at all?

A: No.

Transcript of June 3, 1993, at 69 (emphasis added).

The State on re-direct was permitted to question the police detective about his interrogation of Logan to rebut the inference that no evidence connected Kemp to Juarez's murder in Marana. The police detective testified to the following: he had a tape record-ed conversation with Logan; Logan said he had been in Tucson two or three days before Juarez's disappearance; Logan told him what happened to Juarez; and Logan told him what he and Kemp were doing the night Juarez disappeared. The trial judge determined that this limited line of inquiry was sufficient to meet the improper inference created by Kemp's defense counsel. The trial judge did not permit the State to elicit Logan's statements that Kemp shot Juarez and to explain how it was that Logan knew where the body was located.

Defense counsel objected to the evidence based on hearsay. The trial judge ruled that the questions asserting that "no evidence" connected Kemp to the murder scene created a false inference and opened the door enough to allow the State to rebut this inference.

On appeal, the State argues that some of this evidence is not hearsay because the statements were not offered for proof of their truth, but just for the fact that they were made. Rule 801(c), Ariz.R.Evid. *See* John W. Strong, 2 *McCormick on Evidence* § 250, at 111 (4th ed. 1992). However, the statements were also offered by the State to show that Kemp participated in the murder. Because this is a mixed question, we analyze these statements as if they were hearsay.

▪ Kemp's questioning on cross-examination created the inference that no evidence connected him to Juarez's killing. In fact, there was evidence, Logan's statements, connecting Kemp to the murder scene. Kemp, of course, is entitled to comment on the strength of the State's case against him. If Kemp's defense counsel had asserted that all of the *physical* evidence inculpated Logan but not Kemp, or otherwise limited his inquiry, no improper inference would have been raised. Kemp's counsel went beyond this. He left the jury with the impression that no evidence connected Kemp to the murder.

Kemp invited error with his cross-examination. As we stated in *State v. Lindsey,* "[i]n essence the 'open door' or 'invited error' doctrine means 'that a party cannot complain

about a result he caused.'" 149 Ariz. 472, 477, 720 P.2d 73, 78 (1986) (quoting M. Udall & J. Livermore, *Law of Evidence* § 11, at 11 (3d ed. 1991)). By asserting the non-existence of evidence connecting Kemp to the murder, defense counsel cannot now claim error occurred by meeting the assertion with contrary proof.

We reached the same conclusion in *State v. Martinez,* 127 Ariz. 444, 622 P.2d 3 (1980). Martinez was being tried for armed robbery. He was arrested after a subsequent robbery attempt went awry; his accomplice escaped and was not arrested. Before trial the court granted Martinez's motion to preclude evidence of the subsequent attempted robbery because its prejudice substantially outweighed its probative value.

When Martinez took the stand in his own defense, he testified that he knew his accomplice only "vaguely" and had met him "once when—last November, I think just briefly." *Id.* at 446, 622 P.2d at 5. He also testified that he had seen the rifle used in the robbery in someone else's possession, but was vague about the circumstances. *Id.* The trial court allowed the State to elicit testimony regarding the subsequent robbery attempt, including testimony that Martinez struggled for control of the rifle. *Id.* at 447, 622 P.2d at 6. We rejected Martinez's challenge to the admission of this testimony and stated that "[w]hen the defendant, as here, 'opens the door' by denying certain facts which the evidence, previously excluded, would contradict, he may not rely on the previous ruling that such evidence will remain excluded." *Id.*

 In all events, Kemp suffered no prejudice from the admission of Logan's statements. The only new information the jury learned, that it did not already know from other sources, was that Logan made a statement about what happened the night Juarez was abducted, robbed, and killed. The other evidence was cumulative to Kemp's admissions. Specifically, through Kemp's statement after his arrest, the jury had already been informed of Kemp's con-

cern about Logan, the fact that Logan and Kemp had spent a few days together before the homicide, and that they were together the night of the homicide. Any error would have been harmless in light of the substantial evidence of Kemp's guilt.

### 4. *The Doyle Arguments*

*Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), prohibits the state's use of the accused's invocation of his Fifth Amendment rights. The State asked a police detective about a statement Kemp made after his arrest. On cross-examination, Kemp's counsel asked the police detective about other aspects of Kemp's statement. During the redirect examination of the police detective, the prosecutor asked Detective Salgado:

> Q: At some point, sir, in that same conversation with Mr. Kemp, did you actually come out and ask him questions about the apartment complex parking lot and how Hector Juarez may have gotten in the vehicle with Mr. Kemp.
>
> A: Yes, I did.
>
> Q: At that point, sir, did Mr. Kemp express reluctance to answer your question about the parking lot?

Transcript of June 3, 1993, at 87.

Kemp's objection to the question was sustained before the detective could answer. Although a transcript of Kemp's statement is not part of the record, it appears the answer to the question about the parking lot would have been that Kemp said he was getting nervous. *Id.* at 98. Apparently, the question to which Kemp asserted his *Miranda* rights was a later question asking whether Juarez got into his truck. *Id.* Kemp points to no part of the record to show otherwise. There was no error.

 But even assuming it was an improper question, Kemp suffered no prejudice because his objection was immediately sustained before the witness answered the question. In similar cases, we have held that a

sustained objection protects a party from improper questions. *State v. Sullivan,* 130 Ariz. 213, 217–18, 635 P.2d 501, 505–06 (1981) (holding that prejudice from a question that violated *Doyle* was cured by immediately sustaining objection before the question was answered); *State v. Clark,* 110 Ariz. 242, 244, 517 P.2d 1238, 1240 (1974) (holding that prejudice from question concerning the treatment of defendants found not guilty by reason of insanity to be cured by immediately sustaining objection and by a curative instruction to the jury). Likewise, Kemp's motion for a mistrial was properly denied.

Kemp also argues that the prosecutor commented on Kemp's silence during closing argument. At closing argument, the prosecutor said: "In this particular case, Mr. Kemp and Mr. Logan obviously were out together as Mr. Kemp told Detective Salgado when he talked to him. He was evasive in some of the areas he was giving answers to."

■■■■■ Defense counsel did not object, and thus the point is waived. But even had the point been preserved, there was no error. The prosecutor said that Kemp answered questions evasively. This argument is supported by the statements Kemp made to the police after his arrest and before he asked for a lawyer. Kemp said that he was "cruising" apartment complexes. He said there was "a very good possibility" that he was at the apartment from which Juarez was abducted. He said he was going "in and out" of various apartment complexes. Transcript of June 3, 1993, at 57, 60–61. These answers are evasive. Lawyers are entitled to make arguments based on the evidence and reasonable inferences that can be drawn from the evidence. *E.g., State v. Woods,* 141 Ariz. 446, 454, 687 P.2d 1201, 1209 (1984). The prosecutor's closing argument is supported by the evidence.

### 5. *The Kidnapping and Armed Robbery Convictions*

■■■■ Kemp argues that the evidence is insufficient to find that the victim was kidnapped and robbed, and that his motion for a

directed verdict should have been granted. Kemp abducted the victim from the parking area of his apartment complex. A short time later, Kemp used the victim's ATM card at a location between the place of abduction and the site of the murder. The only reasonable inference to be drawn from the evidence is that Kemp and Logan abducted the victim using the gun purchased the day before, forced him to reveal his ATM personal identification number, and then took his money. The evidence viewed in the light most favorable to sustaining the verdict supports the kidnapping and armed robbery convictions.

### 6. *Prosecutorial Misconduct*

Kemp claims ten instances of prosecutorial misconduct. All but one of these instances are waived because Kemp failed to object at trial. And none of the nine waived instances can be deemed fundamental error. The nine alleged instances of prosecutorial misconduct are either immaterial and non-prejudicial statements, or have been taken out of context by Kemp on appeal.

The preserved instance of alleged prosecutorial misconduct is the following statement by the prosecutor made during closing argument: "[Defense counsel] has gone so far as to suggest we don't even know if it happened in Pima County. You can be sure of one thing. You wouldn't hear the case, number one, and so that particular argument is simply without merit." Transcript of June 4, 1993, at 59. The trial judge overruled Kemp's objection to this statement. The State on appeal concedes that this statement is "arguably improper" but asserts that it is nonetheless harmless. We agree. Defense counsel during closing argument asserted that the State had to prove that Juarez was killed in Pima County. However, the State only had to prove that an element of the offense, such as the kidnapping or the armed robbery, occurred in Pima County. A.R.S. § 13–109. The State proved this, so error, if any, would be harmless.

### 7. *Change of Venue*

■■■■ Kemp argues that the trial judge should have granted a motion for change of

venue because of pretrial publicity. Kemp has not met his burden of showing that the limited pretrial publicity the case received requires this court to presume prejudice. While it is true that Logan made a number of accusations before trial that were reported in the press, those same press articles contained statements by prosecutors and Kemp's defense counsel attacking Logan's veracity and character. The exposure of Kemp's jurors to pretrial publicity was minor and inconsequential.

In addition, the record indicates that Kemp was able to discover whether any juror was actually prejudiced by the pretrial publicity. No juror was so prejudiced, and Kemp does not claim otherwise. The motion was properly denied.

### 8. *Other Jury Issues*

Kemp raises six additional jury selection arguments. First, he argues that the court erred in not providing him a jury roster in advance. Second, he claims the trial court erred in denying his motion to submit a questionnaire to the jury. Third, he claims the trial court should have allowed the lawyers to conduct individual voir dire. Fourth, he claims the death qualification procedure deprived him of a fair trial. Fifth, he claims that the trial court erred in refusing to strike one venire person for cause. Sixth, and finally, he claims that the trial court erred in striking another venire person for cause. All of these claims are without merit.

After reviewing the record, we are convinced that Kemp was tried by a fair and impartial jury. Kemp's jury selection arguments, presented in three and a half pages in his 89 page opening brief, are unclear, lack adequate legal argument and citation to the record. The crux of Kemp's jury arguments seems to be that he was denied an opportunity to question the jury regarding their attitudes and beliefs on homosexuality. But he had the opportunity and elected not to take it. *See ante,* at 1288. Kemp's first four jury claims are inadequately argued and appear to be without merit. We summarily reject

them. *See* Rule 18.3, Ariz.R.Crim.P. (jury roster to be supplied on day jury selection is commenced); Rule 18.5(d), Ariz.R.Crim.P. (trial court shall conduct voir dire and in its discretion allow counsel to question jurors); *State v. Walden,* 183 Ariz. 595, 905 P.2d 974 (1995) (decision to submit a jury questionnaire in the sound discretion of the trial court; death qualification of jury permitted).

Kemp also claims that the trial court erred in not striking a particular juror for cause. The juror indicated that his father-in-law had been convicted of incest twenty years ago. He indicated this would not affect his ability to be impartial. The trial court did not abuse its discretion in failing to strike that juror for cause. *Id.* at 608–09, 905 P.2d at 987–98.

Finally, Kemp claims the trial judge abused his discretion in striking another juror for cause. The juror indicated that he could not participate. He said: "I can't make a decision in this case. I don't have a good excuse. It's too complicated." Transcript of June 2, 1993, at 95. The juror's response indicated he could not be fair or impartial. There was no abuse of discretion. *Id.*

### B. *Sentencing Issues*

#### 1. *The* Enmund *Finding*

Kemp challenges the trial court's finding, pursuant to *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that he actually killed and intended to kill the victim. We reject this claim. First, Kemp's statements to the corrections officials support the finding. Second, two ATM photographs taken shortly after the victim disappeared show someone resembling Kemp using the victim's ATM card. Third, when police confronted Kemp with the photographs, and insisted he was the one using the card, he replied, "Well, I know you guys aren't stupid." Fourth, Kemp purchased the murder weapon the day before the murder.

#### 2. *Prior Violent Conviction*

Kemp first argues that the State did not prove Kemp's prior California robbery con-

viction beyond a reasonable doubt. However, this argument is without merit because he stipulated to his previous conviction.

Kemp also argues that his California robbery conviction is not a prior crime of violence against a person under A.R.S. § 13–703(F)(2). We disagree. Both the State and Kemp agree that the California statute under which Kemp was convicted requires the taking of property *from a person* accompanied by "force or fear" and defines fear as either: "1) The fear of an unlawful injury to the person *or property* of the person robbed.... or 2) The fear of an immediate and unlawful injury to the person *or property* of another in the company of the person robbed at the time of the robbery." Cal.Penal Code §§ 211 (1951) (defining robbery) & 212 (1963) (defining force or fear) (emphasis added). Kemp argues that the California statute does not satisfy the (F)(2) factor because its statutory definition does not require the use or threat of violence against a *person*. Robbery could be committed by threatening force against property.

■ A prior conviction satisfies A.R.S. § 13–703(F)(2) only if it involves the use or threat of violence against a person, *State v. Arnett*, 119 Ariz. 38, 579 P.2d 542 (1978), according to its statutory definition, *State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983). Extrinsic evidence explaining the prior conviction is not admissible to prove that a prior conviction involved violence against a person. *State v. Romanosky*, 162 Ariz. 217, 227, 782 P.2d 693, 703 (1989).

We addressed the California robbery statute in *State v. Correll*, 148 Ariz. 468, 478–79, 715 P.2d 721, 731–32 (1986), and concluded that a robbery conviction under it satisfied (F)(2), at least where it involved the use of a firearm. Yet it was not an armed robbery conviction. The Court treated the robbery conviction as though it were armed robbery because of the sentence enhancement caused by the use of a firearm.

■ The meaning of *Correll* is unclear, if the court actually determined that it was

"*theoretically* possible" to commit a robbery, with or without a weapon, under the California statute in which property, and not a person, was subjected to the threat or use of violence. *Id.* at 479, 715 P.2d at 732. But we do not read *Correll* to say that it is even theoretically possible to commit armed robbery without threatening violence against a person. The Court continued: "As a practical matter 'armed' robbery against the property of a victim does not occur without use or threat of violence against the person as well." *Id.* at 479, 715 P.2d at 732. Thus, the fact that a firearm was used necessarily involved the threat of violence.

■ Even though it was the use of a firearm that was dispositive in *Correll*, we agree with the State that it is also possible to envision a "non-violent" robbery accomplished without a firearm. First, even though it is possible to commit robbery in California by threatening force against property, the person from whom property is being taken actually experiences the fear. Under *State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d 542, 555 (1978), this fear is the violence. *Id.* (defining violence as the "exertion of any physical force so as to injure or abuse."). Second, the California robbery statute requires the "taking of personal property in the possession of another, *from his person or immediate presence*, and against his will" by means of force or fear. Cal.Penal Code § 211 (1951) (emphasis added). Implicit in the California robbery statute is the danger that either the taking itself or the foreseeable resistance to the taking presents the risk of violence. This threat of violence is what makes robbery a more serious crime than larceny. And this threat of violence is the same whether the robbery is accomplished by threatening force against a person or against property. Robbery is clearly a crime against a *person*. It necessarily carries with it the threat or use of violence. Accordingly, Kemp's robbery conviction satisfies A.R.S. § 13–703(F)(2).

### 3. Cruelty

■ Relying on *State v. Poland*, 132 Ariz. 269, 645 P.2d 784 (1982), *appeal after re-*

*mand,* 144 Ariz. 388, 698 P.2d 183 (Patrick) and 144 Ariz. 412, 698 P.2d 207 (Michael) (1985), Kemp argues that the trial court erred in finding that the murder was committed in an especially cruel manner. A.R.S. § 13–703(F)(6). Evidence about "[a] victim's certainty or uncertainty as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies,* 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984).

The evidence supports the finding. Juarez was abducted from the parking area of his apartment complex. His body was discovered approximately 100 feet off a dirt road in the desert north of Tucson. At some point, after his abduction, Juarez provided Kemp with his personal identification number. Two spent bullet casings were found in the area around his body. He died of two gunshot wounds to the back of the head. Kemp on two occasions admitted the killing.

The only reasonable inference from these facts is that Juarez suffered incredible terror from the moment of his abduction until his murder. Once Logan and Kemp had taken him about fifteen miles north of Tucson, Juarez must have experienced great and terrible uncertainty about his fate. The evidence indicates that Kemp must have led Juarez at gunpoint from the truck to the place where the killing occurred. Once he was forced away from the truck and forced to disrobe, he must have known that his murder was imminent. We think this case is more like *State v. Bible,* 175 Ariz. 549, 858 P.2d 1152 (1993), than *Poland, supra.* The cruelty finding is proper.

### 4. *Pecuniary Gain*

The trial judge found as an aggravating factor that the murder was committed for pecuniary gain. A.R.S. § 13–703(F)(5). Kemp argues that this factor is unconstitutional as applied here because it repeats an element of the underlying crime of felony murder. Kemp also argues the finding is not supported by the evidence. We disagree with both contentions.

Kemp first challenges the constitutionality of the (F)(5) factor, asserting that any homi-

cide occurring in the course of an armed robbery will also support a finding that the murder was committed for pecuniary gain. We have previously rejected this argument. *State v. Greenway,* 170 Ariz. 155, 163–65, 823 P.2d 22, 30–32 (1991). In any event, Juarez's killing in the course of the kidnapping is first degree felony murder, wholly apart from the armed robbery conviction. A.R.S. § 13–1105. Thus, Kemp's argument is irrelevant to the constitutionality of the pecuniary gain finding in this case.

■ Second, the evidence supports the finding in this case. Kemp purchased the murder weapon the day before the murder. Juarez's ATM card was used almost immediately after his abduction and before his murder. Kemp committed the armed robbery, kidnapping, and murder with the expectation of receiving something of pecuniary value. *See State v. Spencer,* 176 Ariz. 36, 859 P.2d 146 (1993). The finding is proper.

### 5. *Mitigating Factors*

■ Kemp did not seek to prove the existence of any statutory mitigating factors at sentencing. Kemp attempted to prove the existence of non-statutory mitigation but did not offer any evidence or present witnesses.

Through a sentencing memorandum, Kemp sought to prove the following non-statutory mitigating factors: Kemp suffers from a personality disorder making him perceive others as "selfish, dishonest, and opportunistic" whose "only recourse is to get what [he] can for [himself]," Record on Appeal at 324; Kemp failed to receive requested psychological counselling during previous periods of incarceration in California and Arizona, *id.* at 325; his good behavior, or more specifically, his lack of a disciplinary record, during his previous prison terms, *id.* at 325–26; his good family background and his mother's dependency upon him, *id.* at 326; the fact that he is a follower, based on the evidence presented at trial, *id.* at 327–28; and the fact that the conviction was based on circumstantial evidence, *id.* at 328–29. Kemp did not offer evidence of a neuropsychological

examination that he admits found no evidence of brain impairment.

After the State presented its case to establish three aggravating factors, and the defense presented its case for mitigation, Kemp addressed the court. He said in part:

> The prosecutor, in his alleged wisdom, has portrayed me as being a killer without remorse or regret. This is a wholly inaccurate assessment. I feel a deep and abiding sense of remorse at having permitted friendship to stay my hand in the face of wiser counsel; thus electing not to kill Jeff Logan at a time when both instinct and circumstances demanded his death.

> You can rest assured that is a lapse of judgment I will never repeat and one which I will bend all my energies towards correcting in the not too distant future. Beyond that, I regret nothing ...

> The so-called victim was not an American citizen and, therefore, was beneath my contempt. Wetbacks are hardly an endangered species in this state. If more of them wound up dead, the rest of them would soon learn to stay in Mexico, where they belong.

> I don't show any mercy and I am certainly not here to plead for mercy. I spit on the law and all those who serve it ...

Transcript of July 9, 1993, at 17–18.

The court found that Kemp did not prove the existence of any mitigation. We agree.

The court went on to state that even if the defendant had proved the existence of mitigation, any one of the aggravating factors it found were independently sufficient to call for the death penalty. Kemp argues that this finding makes clear that the trial judge did not consider his mitigation. We disagree. This finding indicates that the trial judge did consider the evidence Kemp offered for mitigation; he found that anything Kemp offered, even if proved, would not have been sufficiently substantial to call for leniency.

Kemp complains that the trial judge relied upon a sentencing order prepared in advance and delivered at the conclusion of the hearing. We find no merit to his argument that this indicates a failure to consider Kemp's proffered mitigation. Kemp also argues that the weighing process was faulty, apparently because he disagrees with the weight given to each mitigating factor. Our review of the record indicates that the trial judge properly determined that there was no mitigation, or alternatively, no mitigation sufficiently substantial to call for leniency.

### 6. *Reliance upon the presentence report*

Kemp argues that the trial judge relied upon the presentence report which apparently contained inadmissible evidence. However, our review of the special verdict indicates that the trial judge only specifically relied upon the presentence report, which is not part of the record, in two instances. First, he relied on it in part to find that Kemp had previously been convicted of a crime of violence. But Kemp stipulated to the fact of his prior California robbery conviction. Second, the trial judge indicated he relied upon it as a possible source of mitigation. While evidence in support of aggravation must be admissible under the rules of evidence, evidence in support of mitigation does not. A.R.S. § 13–703(C). Kemp does not allege that he suffered prejudice from this reliance. The findings of the trial judge in the special verdict are all supported by the evidence.

### 7. *Independent Review*

This Court independently reviews the record in all capital cases and determines whether the death sentence is appropriate. *State v. Hill*, 174 Ariz. 313, 326, 848 P.2d 1375, 1388 (1993). On this appeal we affirm Kemp's three aggravating factors. After balancing the aggravating factors against evidence offered by the defendant, which we find does not rise to level of mitigation, we affirm Kemp's death sentence. Under A.R.S. § 13–703(E), once we have determined the presence of one aggravating factor, and no mitigation, we must affirm the

death sentence. *See Walton v. Arizona*, 497 U.S. 639, 649–51, 110 S.Ct. 3047, 3055–56, 111 L.Ed.2d 511 (1990).

Even if Kemp's proffered mitigation rose to the level of mitigation, we agree with the trial court that none of this evidence is sufficiently substantial to call for leniency.

### 8. *Proportionality Review*

██ Kemp argues he is entitled to have his sentence reduced to life under a proportionality review. This court no longer conducts proportionality reviews of death sentences. *State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992).

### 9. *Kemp's Competency*

██ Kemp addressed the court at sentencing. *Ante*, at 1295. Kemp now argues that the trial judge erred in not ordering, *sua sponte*, a competency hearing under Rule 11.1, Ariz.R.Crim.P. There was no abuse of discretion here. Kemp's statement does not cast doubt on his ability to understand the nature of the proceedings. *See* Rule 11.3, Ariz.R.Crim.P. It does not indicate that he lacked the ability to assist in his defense. If anything, his statement says much about the absence of mitigation here and the propriety of the sentence. Because there were no grounds to conduct a competency hearing, the trial judge did not err in failing to order one *sua sponte*.

### IV. DISPOSITION

We reviewed the record for fundamental error and found none before we decided *State v. Smith*, 184 Ariz. 456, 910 P.2d 1 (1996) (holding that the repeal of A.R.S. § 13–4035 is procedural and not substantive and therefore fully retroactive).[1] For the foregoing reasons, we affirm Kemp's convictions and sentences.

FELDMAN, C.J., ZLAKET, V.C.J., and MOELLER and CORCORAN, JJ., concur.

---

1. The relationship, if any, between our independent review of the propriety of a death sentence and the discontinuance of fundamental error re-

### APPENDIX

Issues waived for failure to argue on appeal.

a. Arizona's death penalty statute violates equal protection by providing non-capital defendants with a jury determination of sentence-enhancing allegations and not providing capital defendants with jury determination of aggravating factors.

b. Arizona's death penalty statute fails to sufficiently channel the sentencer's discretion.

c. Arizona's death penalty statute contains no guidelines for prosecutors.

d. The death penalty in Arizona violates the Eighth and Fourteenth Amendments of the United States Constitution and art. 2, §§ 1, 4, and 15 of the Arizona Constitution.

e. The death penalty in Arizona has discriminatorily been applied in Arizona against poor, young males whose victims are caucasian in violation of the Fourteenth Amendment and Ariz. Const. art. 2, §§ 13 and 15. (In this case, however, the victim is a young Mexican male and the defendant is a middle-aged caucasian.)

f. The trial court did not find that death is "appropriate."

g. Arizona's death penalty statute prevents the consideration of all mitigating factors not meeting the evidentiary standard.

h. Placing the burden of proof on the defendant to show that life is the appropriate sentence is unconstitutional.

i. Judge sentencing violates Kemp's right to have a jury consider all the elements of the offense.

j. A.R.S. § 13–703(F)(6) factor defining cruelty, heinous, and depravity is unconstitutionally vague.

k. The felony murder statute violates the Eighth Amendment by creating a strict liability offense.

---

view will have to await another day—in a case in which it is raised and briefed.

1. The trial court erred by failing to instruct the jury that the proper *mens rea* for felony murder requires a reckless indifference to human life.