**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THOMAS ARNOLD KEMP,
            *Petitioner-Appellant,*

v.

CHARLES L. RYAN, TERRY L.
STEWART, Director; GEORGE
HERMAN,

            *Respondents-Appellees.*

No. 08-99030

D.C. No.
4:00-cv-00050-FRZ

OPINION

Appeal from the United States District Court
for the for the District of Arizona
Frank R. Zapata, Senior District Judge, Presiding

Argued and Submitted
March 10, 2011—Pasadena, California

Filed April 28, 2011

Before: Pamela Ann Rymer, Consuelo M. Callahan, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Callahan

**COUNSEL**

Jon M. Sands, Federal Public Defender, Timothy M. Gabrielsen (argued), and Sylvia J. Lett, Assistant Federal Public

Defenders, of Tucson, Arizona, for petitioner-appellant Thomas Arnold Kemp.

Terry Goddard, Arizona Attorney General, Kent Cattani (argued), Chief Counsel Criminal Appeals, and Donna J. Lam, Assistant Attorney General of Tucson, Arizona, for respondents-appellees Charles L. Ryan, et al.

## OPINION

CALLAHAN, Circuit Judge:

Thomas Arnold Kemp raises three issues in his appeal from the district court's denial of his habeas petition seeking relief from his state conviction for felony first-degree murder, armed robbery and kidnaping and from his capital sentence. First, Kemp asserts that his rights to be free from compelled self-incrimination and to counsel under the Fifth, Sixth, and Fourteenth Amendments were violated when correctional officers asked him questions and his incriminating statements were admitted at trial. Kemp also argues that the district court abused its discretion in denying him discovery to prove this claim. Second, Kemp contends that without his incriminating statements, which should have been suppressed, the prosecution failed to prove beyond a reasonable doubt that he possessed the requisite mental state for the imposition of the death penalty. Third, Kemp claims that he was denied due process under the Fourteenth Amendment when the prosecutor was dilatory in giving notice that he would introduce evidence that Kemp committed a homosexual sexual assault, the trial court failed to rule the subsequent bad act admissible until after the jury had been *voir dired*, and the trial court then denied Kemp's request to *voir dire* the jury on homosexual bias. We affirm. Kemp has not shown that the Arizona Supreme Court's opinion affirming his conviction and capital sentence was either "an unreasonable application of, clearly

established Federal law," or "an unreasonable determination of the facts," as required for relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

# I

## A.  Kemp's Criminal Activities.

The underlying criminal acts were described as follows by the district court:

> On July 11, 1992, at approximately 11:15 p.m., Hector Juarez awoke when his fiancee, Jamie, returned from work to their residence at the Promontory Apartments in Tucson. A short time later, Juarez left to get something to eat. Jamie assumed he went to a nearby fast food restaurant.
>
> At around midnight, Jamie became concerned that Juarez had not come home and began to look for him. She found both her car and his car in the parking lot. Her car, which Juarez had been driving, was unlocked and smelled of fast food; the insurance papers had been placed on the vehicle's roof. After checking with Juarez's brother and a friend, Jamie called the police.
>
> Two or three days before Juarez was abducted, Jeffery Logan, an escapee from a California honor farm, arrived in Tucson and met with Petitioner. On Friday, July 10, Logan went with Petitioner to a pawn shop and helped him buy a .380 semi-automatic handgun. Petitioner and Logan spent the next night driving around Tucson. At some time between 11:15 p.m. and midnight, Petitioner and Logan abducted Juarez from the parking area of his apartment complex.

At midnight, Petitioner used Juarez's ATM card and withdrew approximately $200. He then drove Juarez out to the Silverbell Mine area near Marana. Petitioner walked Juarez fifty to seventy feet from the truck, forced him to disrobe, and shot him in the head twice.

Petitioner then made two unsuccessful attempts to use Juarez's ATM card in Tucson. The machine kept the card after the second attempt. Petitioner and Logan repainted Petitioner's truck, drove to Flagstaff, and sold it. They bought another .380 semi-automatic handgun with the proceeds.

While in Flagstaff, Petitioner and Logan met a man and woman who were traveling from California to Kansas. They abducted the couple and made them drive to Durango, Colorado; in a motel room there, Petitioner forced the man to disrobe and sexually assaulted him.

Later, Petitioner, Logan, and the couple drove to Denver, where the couple escaped. Logan and Petitioner separated. Logan subsequently contacted the Tucson police about the murder of Juarez. He was arrested in Denver.

With Logan's help, the police located Juarez's body. Later that day, the police arrested Petitioner at a homeless shelter in Tucson. He was carrying the handgun purchased in Flagstaff and a pair of handcuffs. After having been read his *Miranda* rights, Petitioner answered some questions before asking for a lawyer. He admitted that he purchased a handgun with Logan on July 10. He said that on the day of the abduction and homicide he was "cruising" through apartment complexes, possibly including the Promontory Apartments. When confronted with the

ATM photographs, he initially denied being the individual in the picture. After having been told that Logan was in custody and again having been shown the photographs, Petitioner said, "I guess my life is over now."

## B.   Kemp's Incriminating Statements While in Jail.

After he was arrested, Kemp was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Later in the evening, Kemp was interviewed by Detective Salgado, but when he was asked about his contact with Juarez, Kemp invoked his right to counsel.

Kemp was taken to the Pima County Jail. During his stay in the jail, Kemp made two incriminating statements. The district court described the events surrounding the statements as follows:

> John Jackson, an officer at the Pima County Jail, walked by Petitioner's cell in the disciplinary pod and they had a three to five minute conversation. Jackson did not recall who initiated the interaction. During the conversation, Petitioner volunteered that he had requested to be moved to the disciplinary pod "because the guy I killed was a Mexican. That the Mexicans in the pod were after him, and he wanted to be moved from there for his own protection." At the time, Jackson did not write a report on the conversation.
>
> Kippy Compton, a Pima County Sheriff's Department correctional officer, recognized Petitioner from a general population pod at the jail. On December 14, 1992, he transported Petitioner within the jail and saw on his identification card that he was in AS1, which is a protective custody status. Compton testified that he must have been off the day they were

briefed about Petitioner's status change; the officers are briefed because they need to be aware of any other inmate(s) the person may need to be kept away from. Compton asked Petitioner why he was in AS1 and testified that Petitioner gave the following response: "that Hispanic guy I killed or the guy I killed was Hispanic and the Hispanic guys in the pod think it's racially motivated, and he — he said the whites said they can't help me or won't help me, and so I asked to be put on protective custody." Compton testified that he was not trying to ask Petitioner about his case because the inmates are not going to talk about their cases and he didn't care. Compton did not question Petitioner further, did not threaten him, or make any promises to him. Compton testified that inmates are expected to respond when questioned by a correctional officer. After thinking about it, Compton decided to write the conversation up in a memo.

While Jackson was carpooling home with Compton one evening, Compton mentioned his conversation with Petitioner and then Jackson mentioned that he had a similar statement from Petitioner. After that conversation, Jackson prepared a report about his conversation with Petitioner.

Kemp filed a pretrial motion to suppress the two statements he had made to Jackson and Compton. The trial court held a hearing on the motion at which both officers testified. The state court found that Kemp's statements to the officers were voluntary and admissible because the conversations were informal and they were not intended or designed to elicit incriminating responses. The officers testified at trial consistent with their testimony at the suppression hearing.

## C. The Alleged Curtailment of *Voir Dire*.

In September 1992, Kemp, through his attorney, first sought discovery with respect to possible prior and subse-

quent bad acts that the prosecutor might seek to present at trial. At a December 1992 pretrial hearing, the prosecutor agreed to give Kemp a list of prospective witnesses and noted that in the afternoon he would be interviewing the "couple that were kidnaped out of Flagstaff." On January 25, 1993, Kemp filed a motion seeking discovery of evidence concerning the alleged kidnaping of the couple, which the trial court granted.

Apparently, the State did not provide Kemp with the information requested, and on May 26, 1993, counsel filed two motions *in limine* to preclude the presentation of any evidence of any prior or subsequent bad acts by Mr. Kemp. One of the motions specifically requested that the kidnaped couple "not be allowed to testify as to any inappropriate sexual behavior by Mr. Kemp towards [the husband]."

On June 2, 2003, the case was called for trial in the Superior Court of Arizona, in and for the County of Pima. The judge was intent on selecting a jury, and when Kemp's attorney, Mr. Larsen, noted that there were unresolved pretrial motions, the court indicated that it intended to begin jury selection "before we hear anything on the motion for change of venue." The prosecutor, Kenneth Peasley, tendered a new witness list, which included the husband abducted in Flagstaff. He indicated that the husband would present evidence concerning: (1) Kemp's silence to statements made by Logan in the husband's presence; (2) the husband's kidnaping; and (3) that "in the room in Durango Mr. Kemp attempt[ed] to sexually molest and assault" the husband. Peasley further claimed that the sexual assault was "proof of all motives that Mr. Kemp has for the killing, and also explains conditions here in Tucson." After Peasley's comments, the trial judge stated "I don't need to hear from you on that now, Mr. Larsen."

A little later, before potential jurors entered the courtroom, Larsen reiterated that he wanted to know "prior to trial what

physical evidence and exhibits" the prosecutor intends to use. The prosecutor apparently stated that he intended to introduce materials seized from Kemp, including photographs of naked men, but would make no reference to Kemp's sexually explicit materials and alleged homosexual act in his opening statement. The trial court indicated that the matter would be considered later.

The trial court then asked the prosecutor and defense counsel whether they were ready to proceed and each answered yes. The prospective jurors were sworn in and the judge proceeded to *voir dire* the jury panel. When the trial judge asked counsel to pass on the panel, defense counsel stated that he had a number of questions. Defense counsel requested a ruling on the evidence that the prosecutor sought to introduce "regarding any sexual matters as it pertains to both [victims]." Larsen was particularly concerned with the possible impact of allegations of sexual molestation on a juror whose father-in-law had been convicted of an incest charge. The trial judge proceeded to ask additional questions of that juror, but did not mention homosexuality. When defense counsel objected that the questions did not begin "to approach what was necessary," the trial judge responded that Larsen had made his record.

After the jury was empaneled, the trial court considered the outstanding motions. The judge, Larsen, and Peasley engaged in an extended discussion of the prosecutor's desire to have the husband testify concerning Kemp's alleged sexual assault and to present other evidence of Kemp's homosexuality. Larsen argued that the alleged incident was irrelevant and should not be admitted as it might inflame the jury. At one point he stated "if we are going to allow this — this onslaught of homosexual activity I want to re-*voir dire* the jury. I want to find out what their thoughts are on homosexuality." The trial judge eventually determined that the "sexual contact with [the husband] is sufficiently relevant to allow that to be admitted into evidence." The trial judge, however, limited the other evidence that could be admitted. The next day, defense coun-

sel reiterated his objections to the admission of the evidence of Kemp's contact with the husband, and argued that it was contrary to the court's prior ruling that no prior bad acts were to be used. Defense counsel, however, did not request further *voir dire* of the jury.

## D. Kemp's Sentencing.

On June 7, 1993, the jury returned verdicts finding Kemp guilty of felony first-degree murder, armed robbery, and kidnaping. The matter proceeded to the sentencing hearing on July 9, 1993. The judge indicated that he had read the presentence report and the memoranda submitted by the parties. The court asked the prosecutor to argue with respect to Kemp's eligibility for the death penalty based on his conviction for felony murder under *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987).[1] The prosecutor argued that the *Enmund/Tison* requirements were met by the evidence that (a) Kemp bought the handgun that was used, (b) Kemp made admissions to Detective Salgado concerning Juarez's disappearance, (c) Kemp used Juarez's ATM card, (d) Juarez's body was found only partially clothed, (e) the husband testified that Kemp attempted to sexually assault him, and (f) Kemp admitted to two correctional officers that he killed Juarez. Defense counsel responded that there was a lack of physical evidence to connect Kemp to Juarez and that the prosecutor's case was compromised by statements made by co-defendant Logan, who was completely unbelievable.

---

[1]The district court explained:

> In *Enmund*, the Supreme Court held that a felony murder defendant is eligible for the death penalty only if he actually killed, attempted to kill, or intended to kill the victim. 458 U.S. at 797. The Court subsequently expanded *Enmund*'s rule so that a felony murder defendant could be sentenced to death if the defendant was a major participant in the underlying felony and acted with reckless indifference to human life. *Tison v. Arizona*, 481 U.S. at 157-58.

The trial judge found Kemp eligible for the death penalty under *Enmund-Tison* for his felony-murder conviction. After considering all the evidence and argument proffered by the parties, including Kemp's statement,[2] the trial judge found that the prosecution had established three aggravating facts beyond a reasonable doubt: (1) Kemp had been previously convicted of a violent felony; (2) Kemp acted for the purpose of pecuniary gain; and (3) the murder was committed in an

---

[2]When Kemp was asked whether he wanted to say something in the way of mitigation, he first indicated that he was pleased with the services of his attorney and then stated:

The prosecutor, in his alleged wisdom, has portrayed me as being a killer without remorse or regret. This is a wholly inaccurate assessment. I feel a deep and abiding sense of remorse at having permitted friendship to stay my hand in the face of wiser counsel; thus electing not to kill Jeff Logan at a time when both instinct and circumstances demanded his death.

You can rest assured that is a lapse of judgment I will never repeat and one which I will bend all my energies towards correcting in the not too distant future. Beyond that, I regret nothing.

The media has engaged in an orgy of speculation and innuendo concerning the events of mid-July '92. They printed and reported every word spewed from Logan's mouth as though they were engraved in stone and handed down from God. They printed every accusation Logan made, whether or not it had the slightest bearing on this case, and at no time made any effort at verification.

I was convicted in the press and on the televised news long before my case ever came to trial. Make no mistake, the day will come when I return to Tucson. And on that day I will remember all the kind things certain reporters had to say about me.

The so-called victim was not an American citizen and, therefore, was beneath my contempt. Wetbacks are hardly an endangered species in this state. If more of them wound up dead, the rest of them would soon learn to stay in Mexico, where they belong.

I don't show any mercy and I am certainly not here to plead for mercy. I spit on the law and all those who serve it; most especially you, Peasley. I have more respect for Salgado than I have for you.

especially cruel manner. The judge further found that Kemp had failed to show any mitigating factors, and concluded that even if any of his assertions rose to the stature of a mitigating factor, it would not be sufficient to call for leniency. The trial court imposed a sentence of death "as prescribed by law for the conviction for murder in the first degree."

## E.    State Post-Trial Proceedings.

On direct appeal, the Arizona Supreme Court affirmed Kemp's conviction and death penalty. *State v. Kemp*, 912 P.2d 1281 (1996). Among the many issues Kemp raised were his challenges to the admission of his comments to the correctional officers. The Arizona Supreme Court rejected these, explaining:

> The trial judge's finding that the statements were voluntary was not clearly and manifestly wrong. *See State v. Scott*, 865 P.2d 792, 797 (1993). The record supports the finding that the corrections officials were not attempting to overcome Kemp's will to induce him to inculpate himself. While Jackson and Compton testified that inmates generally had to respond to their inquiries, their questions concerned only the "day to day" circumstances of his incarceration. Kemp was not obligated to make these admissions. *Cf. Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (noting that inquiries between the accused and the State "relating to routine incidents of the custodial relationship[ ] will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards* [*v. Arizona*, 451 U.S. 477 (1981) (holding that a request for a lawyer requires the police to cease questioning until the accused consults with his or her lawyer unless the defendant initiates further conversation) ].").

> Kemp argues that *Miranda* requires the exclusion of the statements because he had previously asserted

his right to counsel. *Edwards v. Arizona*, 451 U.S. 477 (1981). But *Miranda* only applies to custodial interrogation. Jackson and Compton did not attempt to elicit an incriminating response from Kemp. *See Rhode Island v. Innis*, 446 U.S. 291 (1980) (holding that a comment made by one police officer to another, in the presence of the accused, expressing concern that handicapped children might come across a shotgun, is not a statement designed to elicit an incriminating response).

Compton only asked Kemp why he was in protective custody. He did not interrogate him. Routine inquiries by guards concerning the security status of prisoners are not statements designed to elicit an incriminating response. *Id*. Compton's question was reasonable and relevant to maintaining order in the prison and protecting Kemp. Similarly, Kemp's statements to Jackson were the product of ordinary, everyday interaction between guard and prisoner. Because Kemp was not interrogated by Compton and Jackson, the admission of his statements did not violate *Miranda* and his rights under art. 2, § 24 of the Arizona Constitution.

Kemp's assertion that his Sixth Amendment *Massiah* rights were violated fails for the same reason his *Miranda* claim fails: the guards did not seek to elicit incriminating evidence from him. *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (holding that "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"). Kemp's admissions therefore were properly admitted.

912 P.2d at 1287.

The Arizona Supreme Court also addressed Kemp's arguments concerning the admission of his alleged assault of the husband. It first held that even if evidence of the alleged assault should have been excluded, its admission was harmless error because "Kemp's conviction is supported by overwhelming evidence of his guilt, including his own statements to the police and corrections officials." *Kemp*, 912 P. 2d at 1288. The court further ruled:

> Kemp also argues that the prosecutor did not timely disclose that the subsequent homosexual assault would be used against him. Before trial, the court on two occasions ordered the State to disclose the bad acts it would use. *See* Rule 15.1(a)(6), Ariz. R. Crim. P. The State did disclose the victim of the subsequent homosexual assault as a possible witness approximately six months before trial. While it never provided Kemp with a list of his bad acts, Rule 15.1(a)(6) appears to apply to prior acts and not subsequent conduct. But even if Rule 15.1(a)(6) applies here, there simply was no prejudice.
>
> Discovery rulings are affirmed unless there is an abuse of discretion. *See State v. Krone*, 897 P.2d 621, 624 (1995). Kemp argues that he was unable to obtain a fair and impartial jury and he was unable to develop any impeachment or motive evidence against the victim of the subsequent homosexual assault. We disagree.
>
> First, the record is clear that Kemp's trial counsel was aware that Kemp's homosexuality potentially would be placed before the jury. Logan's statements to the police and media raised the issue. In addition, Logan's trial preceded Kemp's, and the witness Kemp sought to preclude testified regarding the same events at Logan's trial. Furthermore, Kemp successfully suppressed other evidence of his homo-

sexuality, including sexually explicit photographs and a journal purportedly detailing his homosexual encounters. Although Kemp did not have a ruling regarding the bad act evidence prior to *voir dire*, he was clearly aware of the issue, was not surprised, and could have developed it at *voir dire* if he so wanted.

Second, Kemp's argument that he was unable to develop impeachment or motive evidence is without merit. The only connection the witness had to Kemp was the misfortune of being his kidnaping, robbery, and sexual assault victim. The witness was listed approximately six months before Kemp's trial and testified about the same events at Logan's trial. There was no abuse of discretion.

*Id.*

In February 1999, Kemp filed a petition for post-conviction relief with the trial court claiming ineffective assistance of counsel. The trial court denied the petition in May 1999, and in January 2000, the Arizona Supreme Court denied the petition for review.

## F. Federal Habeas Corpus Proceedings.

In January 2000, Kemp filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the District of Arizona. Proceedings were stayed to allow Kemp to seek relief in state court pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), and in August 2003, the Federal Public Defender was appointed as replacement counsel for Kemp.

In March 2005, the district court filed an order finding that six of Kemp's claims were procedurally defaulted, denying relief on another count, and finding that one asserted claim was not cognizable. In August 2006, Kemp moved for discov-

ery and an evidentiary hearing concerning the circumstances surrounding his statements to the correctional officers. After briefing, the district court on September 17, 2007, denied the request for discovery and an evidentiary hearing. The district court agreed with the Arizona Supreme Court that Kemp's statements to the correctional officers were voluntary.[3] It further determined that "[n]othing in the brief contacts between either of the correctional officers and Petitioner was reasonably likely to elicit an incriminating response; the interactions carry no indicia of an interrogation." The district court also determined that Kemp's right to counsel was not violated by the communications with the correctional officers. In addition, the court held that "[b]ecause listening-in on conversations and reporting them is not unconstitutional," there was no good cause for the requested discovery.

The district court also rejected Kemp's *Enmund-Tison* claim. The court noted that the state court's factual findings including the jury's special verdict that Kemp "intended to kill and did kill the victim" are presumed correct. The district court found that the totality of the evidence, including Kemp's statements to the correctional officers, was more than sufficient to allow a rational factfinder to "find that Petitioner killed, intended to kill or was a major participant in the under-

---

[3]The district court commented:

First, there is no clear evidence that Jackson posed any question to Petitioner; Jackson does not recall who initiated the conversation and testified that Petitioner volunteered the statement about his housing status. Second, the fact that Petitioner was obligated to respond to either Compton and/or Jackson, in no way indicated that his incriminating responses were coerced. Petitioner could have truthfully and appropriately answered questions regarding why he was in a protective custody status without incriminating himself. Even if answering necessarily required a response regarding the crime with which he was **charged**, it did not require an admission about guilt. Nothing in the circumstances of Petitioner's statements indicates that his will was overborne. (emphasis in original).

lying felony and acted with reckless indifference to human life."

On September 11, 2008, the district court issued a Memorandum of Decision and Order denying the remaining claims in Kemp's habeas petition. The court rejected Kemp's claim to *voir dire* regarding homosexuality for several reasons. First, it found that "the record plainly shows that prior to *voir dire* the defense was on notice that the sexual assault victim was a potential witness whose testimony would address the subsequent bad act." Second, it held that "[e]ven assuming the existence of Supreme Court precedent applying the same *voir dire* requirements with respect to issues of race and sexuality, such *voir dire* was not required in Petitioner's case because the sentencing was not carried out by the jury but by the trial judge." Third, the court determined that Kemp's "homosexuality was not 'inextricably bound up with' his case to the extent that specific inquiry into the issue of homosexuality was required," and that "the issue of homosexuality was not bound up with the defense; nor did the trial involve allegations of homosexual prejudice." Finally, the trial court concluded, citing *Mu'Min v. Virginia*, 500 U.S. 415 (1991), that Kemp "has not shown that the lack of *voir dire* on the issue of homosexuality rendered his trial 'fundamentally unfair.' "

The district court on September 29, 2008, certified three issues for appeal:

> Whether Claim 2 of the Amended Petition — alleging that Petitioner's right to a fair and unbiased jury was violated by the trial court's refusal to allow *voir dire* on the issue of homosexual bias — is meritorious.

> Whether Claim 3 of the Amended Petition — alleging that the admission of Petitioner's statements to two correctional officers was unconstitutional — is meritorious.

> Whether Claim 12 — alleging that there was insufficient evidence to support a finding of death eligibility if the statements of the correctional officers had been excluded — is meritorious.

Kemp filed a timely notice of appeal on October 27, 2008.

## II

A district court's denial of a § 2254 habeas petition is reviewed de novo. *Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1011 (9th Cir. 2009); *Pham v. Terhune*, 400 F.3d 740, 741 (9th Cir. 2005) (per curiam). The district court's findings of fact are reviewed for clear error, *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir. 1995), legal conclusions are reviewed de novo, *Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008), and we may affirm on any ground supported by the record. *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

Because Kemp's federal habeas petition was filed after the effective date of AEDPA, relief can only be granted if the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See Williams v. Taylor*, 529 U.S. 420, 429 (2000).

## III

Kemp raises three arguments on appeal: (1) his rights to be free from compelled self-incrimination under the Fifth

Amendment and to counsel under the Sixth Amendment were violated when the correctional officers stimulated conversations with him and elicited incriminating statements that were admitted at trial; (2) without his statements to the correctional officers there is insufficient evidence to support the imposition of a capital sentence under *Enmund*, 458 U.S. 782, and *Tison*, 481 U.S. 137; and (3) he was denied due process when the prosecutor was dilatory in giving notice that he would introduce evidence that Kemp committed a homosexual assault subsequent to the murder and Kemp was denied the opportunity to *voir dire* the jury on homosexual bias.

## A. Admission of Kemp's Incriminating Statements Did Not Violate His Rights Under the Fifth and Sixth Amendments.

Kemp advances two lines of argument to support his claim that his incriminating statements should not have been admitted. First, he argues that the Arizona Supreme Court unreasonably applied *Edwards*, 451 U.S. 477, to his case. Second, he argues that because the record is "devoid of all facts necessary to determine what the officers intended" the district court should have granted his request for further discovery and an evidentiary hearing. We determine that the Arizona Supreme Court did not render a decision that was contrary to or an unreasonable application of the controlling Supreme Court cases and that the district court did not err in denying Kemp further discovery and an evidentiary hearing.

### 1. *The Arizona Supreme Court did not unreasonably apply clearly established Federal law.*

Kemp argues, citing *Edwards,* 451 U.S. at 484-85, that the Supreme Court set forth a clear rule that once a defendant in custody has expressed his desire to deal with the police only through counsel, the officers may not ask any further questions. He contends that only the accused may initiate a conversation in order for there to be a valid waiver of the

accused's rights. Kemp claims that the court's reliance on
*Bradshaw*, 462 U.S. at 1045, was faulty because in that case
only a plurality of the Supreme Court stated, in dicta, that
police may lawfully initiate conversations after an accused
had invoked his Fifth Amendment right to remain silent.
Kemp further asserts that cases relied on by the Arizona
Supreme Court, such as *Innis*, 446 U.S. 291, are distinguish-
able because they involve situations where the accused initi-
ated communications.

**[1]** We do not agree with Kemp's reading of the control-
ling Supreme Court opinions. In *Innis*, the Supreme Court
reiterated that the term "interrogation" under *Miranda* "refers
not only to express questioning, but also to any words or
actions on the part of the police **(other than those normally
attendant to arrest and custody) that the police should
know are reasonably likely to elicit an incriminating
response.**" *Id.* at 301 (emphasis added). The Court further
noted that "[i]nterrogation . . . must reflect a measure of com-
pulsion above and beyond that inherent in custody itself." *Id.*
at 300. It also noted that "since the police surely cannot be
held accountable for the unforeseeable results of their words
or actions, the definition of interrogation can extend only to
words or actions on the part of police officers that they
**should have known** were reasonably likely to elicit an
incriminating response." *Id.* at 301-02 (emphasis in original).

**[2]** The Arizona Supreme Court held that *Miranda* did not
apply because Compton only asked Kemp why he was in pro-
tective custody and did not interrogate Kemp. *Kemp*, 912 P.2d
at 1286-87. Such an inquiry qualifies as a question that is
"normally attendant to . . . custody," and thus, not covered by
*Miranda*. The Arizona Supreme Court's application of *Innis*
was not "an unreasonable application of clearly established
Federal law" under § 2254(d)(1).

The reasonableness of the Arizona Supreme Court's per-
spective is supported by the plurality opinion in *Bradshaw*.
Then-Justice Rehnquist writing for four Justices commented:

> While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in *Edwards*.

462 U.S. at 1045. Admittedly, this position was adopted by only a plurality of the Court. However, the fact that four Supreme Court Justices believe that "a bare inquiry by . . . a police officer should not be held to 'initiate' any conversation" affirms that a similar perspective by the Arizona Supreme Court is not unreasonable.[4]

**[3]** Because the Arizona Supreme Court's holding that the questions by the correctional officers did not constitute "interrogations" under *Innis* was not an unreasonable application of that precedent, Kemp's claim under *Massiah v. United States*, 377 U.S. 201 (1964), must also fail, since nothing in the record or Supreme Court case law indicates that the specific type of custody-related inquiry at issue here was "designed deliberately to elicit incriminating remarks," *Kuhlmann v.*

---

[4]*See Murdoch v. Castro*, 609 F.3d 983, 991-93 (9th Cir. 2010) (en banc) ("[W]hen there is a principled reason for the state court to distinguish between the case before it and Supreme Court precedent, the state court's decision will not be an unreasonable application of clearly established Supreme Court law.").

*Wilson*, 477 U.S. 436, 459 (1986). Accordingly, the Arizona Supreme Court's reasonable application of "clearly established Federal law" with regard to Kemp's Fifth Amendment claim, is also a reasonable application of the law with regards to his Sixth Amendment claim.[5]

> 2. *The Arizona Supreme Court's factual determinations are not unreasonable.*

a. *Kemp's contentions.*

Kemp does not directly challenge the state courts' determination that the officers did not attempt to elicit incriminating responses and did not interrogate him. Instead, Kemp contends that the district court should have granted his request for further discovery.[6] Kemp sought discovery in order to prove that contrary to the factual determination of the state courts, the correctional officers "engaged him in conversations in order to acquire incriminating information about his case." Kemp claims that the information sought would show that officers were trained to intentionally eavesdrop on and memorialize conversations with inmates, and to provide inmate statements to the Pima County Attorney.

---

[5] Our conclusion is also supported by the Supreme Court's opinion in *Montejo v. Louisiana*, 129 S. Ct. 2079 (2009). In *Montejo*, the Supreme Court overruled the rule announced in *Michigan v. Jackson*, 475 U.S. 625 (1986), "forbidding police to initiate interrogation of a criminal defendant once he has requested counsel at an arraignment of similar proceeding." *Id.* at 2082. Instead, the Court held that the prophylaxis afforded by *Miranda* and *Edwards* were sufficient. *Id.* at 2090. The Court commented that because the right to be free from compelled self-incrimination and the right to counsel are "waived using the same procedure, . . . doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." *Id.*

[6] Kemp sought to depose Officers Compton and Jackson, and requested subpoenas for records of the Pima County Jail, Pima County Sheriff's Office, and the Pima County Attorney's Criminal Division for the period 1990 through 1993.

In support of his discovery request, Kemp asserted that in a Pima County capital murder trial held prior to his trial, a correctional officer testified that: (1) he overheard a conversation between the defendant and another jail inmate; (2) there was paper and a writing instrument available to him to memorialize the conversation; and (3) the highly incriminating statements were passed on to the Pima County Attorney's office for use in the prosecution.[7] *See State v. Eastlack*, 883 P.2d 999, 1008 (Ariz. 1994). He further claims that in another Pima County capital case, *State v. Moody*, 94 P.3d 1119, 1142 (Ariz. 2004), a Pima County correctional officer was ordered to keep an eye on an inmate and subsequently testified as to the inmate's incriminating statements. Kemp argues that "evidence that correctional officers are trained to question inmates about their cases and memorialize the inmates' responses to such questioning would seriously undermine the state courts' determinations that Compton and Jackson's contact with Kemp did not constitute interrogation about his case."

Kemp further notes that the prosecutor in his case, Peasley, was subsequently disbarred for suborning perjury from a police detective in another capital prosecution in Pima County. *See In re Peasley*, 90 P.3d 764, 778 (Ariz. 2004). Kemp argues that given Peasley's track record, the district court should have allowed him to explore the relationship between Peasley and the two correctional officers.

Kemp argues that he demonstrated good cause for discovery as required by Rule 6(a) of the Rules Governing Habeas Proceedings in the District Courts. He claims he has made the requisite showings of credible allegations of a constitutional violation and that the discovery would enable him to investigate and prove his claim. He asserts that the Supreme Court's opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004), acknowl-

---

[7]Kemp notes that the prosecutor in that case was later disciplined for unethical behavior in a homicide prosecution, *see In re Zawada*, 92 P.3d 862 (Ariz. 2004).

edges the relevance of law enforcement training with respect to interrogations. Here, Kemp claims that discovery is necessary because of the possible subtle means of interrogation employed in the Pima County Jail. Moreover, an evidentiary hearing is allegedly necessary because the district court had insufficient evidence to appreciate why the evidence produced at the state suppression hearing was inadequate.

Kemp admits that he did not develop the factual basis for discovery in the state courts, but argues that this was not the result of a lack of diligence. He asserts that his trial counsel "was not reasonably on notice, based on the suppression hearing testimony, that evidence might have existed in the form of the officers' training or the existence of printed or video training materials that would have undermined the testimony given by Officers Compton and Jackson." Kemp contends that the correctional officer's testimony in *Eastlack*, which was given less than two years before his trial, "could not have been reasonably known to Kemp's trial counsel because that testimony was not mentioned in the Arizona Supreme Court's decision in that case." Kemp claims that it was "mere fortuity" that his present counsel learned of the officer's testimony in *Eastlack*, and argues that where "a capital habeas petitioner learns by sheer happenstance of the existence of facts that might have supported a claim in state court, he cannot be determined to have lacked diligence in developing the supporting facts for his claim."

Based on the foregoing, Kemp asserts that he "met the burden of establishing 'good cause' for the discovery he sought, and the district court abused its discretion in failing to allow discovery."

   b.  *The district court reasonably denied Kemp's discovery request and request for an evidentiary hearing.*

[4] We first consider whether AEDPA bars Kemp from having an evidentiary hearing on his claim that correctional

officers deliberately elicited incriminating statements, in violation of his Sixth Amendment rights. If AEDPA imposed such a bar in this case, the petitioner could not show good cause, and the district court would not have abused its discretion by denying Kemp's discovery request.[8]

**[5]** Section 2254(e)(1) of AEDPA bars most evidentiary hearings if the applicant "failed" to develop the factual basis for the claim in state court. In this context, "failed" "connotes some omission, fault, or negligence on the part of the person who has failed to do something." *Williams*, 529 U.S. at 431-32. If the petitioner is not at fault (as defined for purposes of § 2254(e)(1)), we evaluate the propriety of an evidentiary hearing under the factors prescribed by *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992). *Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).

If the court determines that the applicant did fail to develop the factual basis for a claim in state court, the district court can hold an evidentiary hearing only if the petitioner meets two demanding requirements: First, the claim must rely on a rule of constitutional law newly announced by the Supreme Court and available to habeas petitioners, 28 U.S.C. § 2254(e)(2)(A)(I), or must be based on facts that "could not have been previously discovered through the exercise of due diligence," § 2254(e)(2)(A)(ii). Second, even if a petitioner raises a new claim or one based on a new factual predicate, a hearing is required only if "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found applicant guilty of the underlying offense." § 2254(e)(2)(B).

---

[8]Habeas Corpus Rule 6(a) allows parties to "invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

**[6]** Our first inquiry, then, is whether Kemp "failed to develop the factual basis of [his] claim in State court proceedings." § 2254(e)(2). Kemp admits that he did not develop his claims in the state courts but claims that his course of action was reasonable, and hence not a "failure" within the meaning of § 2254(e)(2), because he did not have necessary information while his case was still in state court.[9] This argument fails, because the information that, according to Kemp, provided a new basis for his claim that the officers deliberately elicited incriminating information, does not actually provide such a basis. He has only the officer's testimony in *Eastlack*, 883 P.2d 999, allegations concerning the proceedings in *Moody*, 94 P.3d 1119, and the attorney discipline actions against prosecutors Peasley and Zawada.

**[7]** None of these support the assertion that there was a policy in the Pima County Jail to subtly interrogate the inmates. The officer in *Eastlack* only testified that (a) Eastlack was speaking to another inmate in a loud voice and refused to lower his voice, (b) he recorded the conversation because it struck him as interesting that Eastlack was talking about his case, and (c) note paper was available for whatever need there might be, not just for recording incriminating statements. *Eastlack*, 883 P.2d at 1008. Similarly, in *Moody*, the officer was sitting approximately fifteen feet from Moody, who knew he was there and made no effort to lower his voice or speak softly. 94 P.3d at 1143. The Arizona Supreme Court held that there was "no surreptitious eavesdropping, recording, or reporting of communications" and that the trial court could "reasonably have concluded that Moody waived the

---

[9]Arizona, in addition to contesting Kemp's request for discovery on its merits, argues that Kemp should have developed his claim in collateral proceedings in state court, but failed to do so. Arizona also asserts that Kemp's assertion that he was entitled to discovery is not properly before the court because it was not included as an issue in the Certificate of Appealability. We determine that the denial of discovery is encompassed within the grant of a certificate on the question of the admission of Kemp's statements to the two correctional officers.

confidentiality of the communication with his attorney by making no effort to safeguard the content of his conversation." *Id*. at 1144. Thus, neither case suggests that there was any policy of deliberately eliciting incriminating information from inmates.

Furthermore, Kemp's assertion of a policy of deliberately eliciting incriminating information is not advanced by the reference to the attorney discipline actions against Zawada and Peasley. Peasley's unethical behavior concerned an officer stating under oath that he had not known that a person was a suspect, when he had. *See Peasley*, 90 P.3d at 769. Zawada was disciplined for knowingly implying unethical conduct by expert witnesses without supporting evidence. *See Zawada*, 92 P.3d at 867. In neither case is there anything that suggests the existence of a policy of interrogating inmates.[10]

[8] As the above discussion shows, none of the "evidence" that Kemp has acquired since his conviction even remotely supports his assertion of a policy of deliberate subtle elicitation of information by Pima County correctional officers. The only salient fact Kemp has to buttress his claim is that two correctional officers spoke with him and both eventually made a report of that conversation, yet that information was available to him before his original criminal trial. He thus possessed all relevant information that would support his claim well before the conclusion of his state proceedings. Accordingly, Kemp has "failed" to develop the bases of his claim and it is barred under § 2254(e)(1) unless he can satisfy

---

[10]Moreover, the officers' trial testimony was to the contrary. Jackson testified that he did not recall who initiated his conversation with Kemp, he did not talk to his supervisor about the conversation, and did not memorialize the conversation for some time. Compton testified that he needed to know why Kemp was in protective custody and was not trying to ask Kemp about his case. Both Jackson and Compton testified under oath in the state court proceedings and there is nothing, other than Kemp's unsupported allegations, to suggest that either testified in a misleading or dishonest manner.

the strictures of § 2254(e)(2)(A)-(B).[11] Kemp, however, cannot meet this demanding standard. His claim does not rely on a new rule of constitutional law available to habeas petitioners. § 2254(e)(2)(A)(I). Moreover, because Kemp has not shown that his failure to develop the factual basis for his claim in state court was due to the discovery of new information not available until after trial, Kemp has also failed to show a "a factual predicate that could not have been previously discovered through the exercise of due diligence," § 2254(e)(2)(A)(ii).

**[9]** Because Kemp is not entitled to an evidentiary hearing, the district court did not err in denying his request for discovery, as well as his request for a hearing. First, because the district court was not authorized to hold an evidentiary hearing on Kemp's deliberate elicitation claim, obtaining discovery on that claim would have been futile. Moreover, Kemp's claim of a jail-wide policy of eliciting incriminating statements has many of the indicia of an improper "fishing expedition," and the desire to engage in such an expedition cannot supply "good cause" sufficient to justify discovery. *See Rich v. Calderon*, 187 F.3d 1064, 1067-68 (9th Cir. 1999) (noting that in habeas proceedings discovery is only available "in the discretion of the court and for good cause shown" and is not "meant to be a fishing expedition for habeas petitioners to explore their case in search of its existence.") (internal quotation marks omitted). Accordingly, the district court's discovery denial also was not an abuse of discretion.

---

[11]Even if Kemp had not failed to develop the bases of his claim, he still would not be entitled to an evidentiary hearing because he cannot satisfy *Townsend*'s requirement of "alleg[ing] *specific* facts which, if true, would entitle him to relief." *Earp*, 431 F.3d at 1167 & n.4 (emphasis added). Kemp's vague assertions of a policy of deliberate elicitation cannot, without greater detail or a shred of substantial supporting evidence, amount to a colorable claim. He therefore would not be entitled to an evidentiary hearing even if he overcame the "failure" bar of § 2254(e)(2).

**B. Because Kemp's Incriminating Statements Were Admissible, There is Sufficient Evidence to Support the Imposition of the Death Penalty Under *Enmund* and *Tison*.**

[10] Kemp's argument that there was insufficient evidence to support the imposition of the death penalty was based on his claim that his incriminating statements were not admissible. Our determination that his statements were admissible disposes of his arguments under *Enmund* and *Tison*. We need not consider whether Kemp's assertion would have been persuasive if the statements were inadmissible, but we do conclude that with those statements there is no constitutional barrier to affirming his sentence.

In *Enmund*, the Supreme Court held that the death penalty could not be imposed on a defendant who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797. In *Tison*, the Supreme Court stated that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." 481 U.S. at 157-58.

[11] Here, the evidence, including Kemp's incriminating statements, is more than sufficient to support the state courts' determination that Kemp possessed the requisite culpable mental state to allow the imposition of a capital sentence.

**C. Kemp Was Not Denied Due Process By the Trial Court's Failure to Allow Him to Re-*voir dire* the Jury on Possible Homosexual Bias**.

Kemp asserts that the Due Process Clause of the Fourteenth Amendment guarantees a defendant not only an impartial

jury, but also an adequate *voir dire* in order to identify unqualified jurors. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1991) ("part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors"). Kemp recognizes that to be constitutionally compelled, it is not enough that *voir dire* questions might have been helpful, rather the failure to ask the questions "must render the defendant's trial fundamentally unfair." *Mu'Min*, 500 U.S. at 425-26.

Kemp asserts that homosexual bias is similar to racial bias. He notes that in *Ham v. South Carolina*, 409 U.S. 524, 525-27 (1973), the Supreme Court held that *voir dire* on racial bias was constitutionally compelled where an African American civil rights advocate's defense to criminal drug charges was that he was framed due to his prominence in the community.

Kemp claims his trial was fundamentally unfair because the trial court refused to allow him to re-*voir dire* the jury after the court denied his motions *in limine* that would have barred introduction of the subsequent homosexual assault of the husband. Kemp argues that the prosecutor was dilatory in giving the required notice that he intended to introduce evidence of Kemp's homosexual assault of the husband, and was rewarded for his gamesmanship when the trial court allowed the evidence to be admitted. Kemp further argues that his homosexuality was bound up with the conduct of the trial. The prosecutor argued to the jury that Kemp's homosexuality and alleged desire to engage in homosexual activities served as a motive for the kidnaping and murder of Juarez. The prosecutor introduced the husband's testimony to prove a homosexual assault, and in his closing argument, told the jury that Kemp's homosexual drive was behind the kidnap and murder of Juarez as well as his attack on the husband.

Kemp contends that it would have been "fundamentally unfair to have required Kemp's counsel needlessly to interject his client's homosexual orientation into the *voir dire*, with the

potential for prejudice it held, were the trial court ultimately to have ruled the homosexual assault on [the husband] inadmissible.”

Kemp has the burden of showing that the Arizona Supreme Court's decision upholding the trial court's decision not to re-*voir dire* the jury was contrary to or an unreasonable application of clearly established Supreme Court precedent. He cannot make this showing. Even in the cases cited by Kemp, the Supreme Court emphasizes that *voir dire* “is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.” *Morgan*, 504 U.S. at 729. *See also Mu'Min*, 500 U.S. at 427 (“our own cases have stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias”). When a state court is asked to apply a general standard, such as the *Strickland* standard for ineffective assistance or the “fundamental unfairness” standard at issue here, state courts get even greater “leeway” than is standard under our already-deferential AEDPA framework. *Knowles v. Mirzayance.* 129 S. Ct. 1411, 1420 (2009); *accord Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); and *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

**[12]** Kemp has not made either the legal or factual showing necessary to satisfy § 2254(d). Kemp's attempt to equate bias against homosexuals with racial prejudice is not persuasive. In *Ham*, the Supreme Court held that an inquiry as to racial prejudice was constitutionally compelled in that case, but that “[g]iven the traditionally broad discretion accorded to the trial judge in conducting voir dire,” Ham's constitutional rights were not violated when the judge refused to question the jury about prejudice against beards. 409 U.S. at 528. In *Mu'Min*, the Supreme Court commented

> We enjoy more latitude in setting standards for voir dire in federal courts under our supervisory power

than we have in interpreting the provisions of the Fourteenth Amendment with respect to voir dire in state courts. But two parallel themes emerge from both sets of cases: First, the possibility of racial prejudice against a black defendant charged with a violent crime against a white person is sufficiently real that the Fourteenth Amendment requires that inquiry be made into racial prejudice; second, the trial court retains great latitude in deciding what questions should be asked on voir dire.

500 U.S. at 424. In *Ristaino v. Ross*, 424 U.S. 589 (1976), the Supreme Court held that it was not always necessary to *voir dire* a jury on racial prejudice, even when the victim was white and the defendants were black. *Id.* at 597.

**[13]** Kemp has not offered any case law holding that homophobia should be elevated to the same level as racial prejudice. In light of the Supreme Court's affirmance of the discretion granted the trial court and its suggestion that *voir dire* on racial prejudice is not always constitutionally compelled, even when the victim and the defendant are of different races, Kemp has failed to show that the Arizona Supreme Court contravened or unreasonably applied "clearly established Federal law" in rejecting his challenge to the trial court's failure to re-*voir dire* the jury on possible homosexual bias.

**[14]** The record also does not support Kemp's claim that he was denied due process. First, a review of the record shows that trial counsel never asked to re-*voir dire* the jury. After the selection of the jury, during argument on outstanding motions, counsel stated "if we are going to allow this — this onslaught of homosexual activity I want to re-*voir dire* the jury." However, when the trial court ruled that it would exclude some evidence of homosexual activity, but would allow in other evidence, Kemp's counsel did not ask to re-*voir dire* the jury.

**[15]** Second, the record supports the determinations by the Arizona Supreme Court and the district court that Kemp's counsel was aware that Kemp's homosexuality potentially would be placed before the jury. *See Kemp*, 912 P.2d at 1288. Juarez was found in the desert shot in the head twice and wearing only his socks. Logan's statements to the police and the media raised Kemp's homosexual proclivity as an explanation for Juarez's attire. Moreover, the prosecutor indicated well before trial that he was inclined to call the husband and that he would seek to introduce other evidence of Kemp's homosexuality. Even assuming that the trial judge should have ruled on Kemp's *in limine* motion before picking a jury, Kemp's counsel cannot reasonably claim that he was not aware that evidence concerning Kemp's homosexuality would be admitted at trial.

**[16]** Third, despite Kemp's claim that his alleged homosexuality was central to the case, the critical evidence of the murder did not concern homosexuality. The critical evidence consisted of the videotape of Kemp using Juarez's ATM card, his admission to Detective Salgado, and his incriminating evidence to the correctional officers. None of this evidence had anything to do with his homosexuality.[12]

**[17]** Fourth, as noted by the district court, the jury did not participate in the sentencing proceeding. The fact that the sentence was determined by the judge, rather than the jury, reduces the impact of any latent bias by any member of the jury. Accordingly, the Arizona Supreme Court's decision was not predicated on an unreasonable determination of the facts. *See* § 2254(d)(2).

---

[12]Kemp's argument that his alleged homosexuality was central to the case undercuts his argument that he was prejudiced by the trial court's failure to re-*voir dire* the jury. If homosexuality was bound up in the case, then Kemp presumably knew this from the time of the indictment and the failure to include any question regarding homosexuality in the initially requested *voir dire* questions would appear to have been a strategic choice.

**[18]** In sum, Kemp has failed to show that the trial court's alleged failure to allow him to re-*voir dire* the jury as to possible bias against homosexuals was an unreasonable application of clearly established Supreme Court law or an unreasonable determination of the facts. He is not entitled to habeas relief on this claim.

## IV

Kemp has not carried his burden of showing that he is entitled to relief on his appeal from the district court's denial of his habeas petition. Because his petition was filed after the effective date of the AEDPA, relief can only be granted if the state court unreasonably applied clearly established federal law or unreasonably determined the facts. 28 U.S. § 2254(d). Kemp has failed to show that the Arizona Supreme Court acted unreasonably under either of these criteria in rejecting his arguments that admission of his incriminating statements to correctional officers violated his rights under *Miranda* and *Massiah*. He has not shown that the district court abused its discretion in denying his request for discovery and an evidentiary hearing because he did not establish "specific facts which, if true, would entitle him to relief." *Earp*, 431 F.3d at 1167 n.4. We do not reach Kemp's claim that if his incriminating statements are excluded there is insufficient evidence to support the imposition of the death penalty under *Enmund/Tison*, because we hold that the statements are admissible and that the evidence presented, including the statements, provides a sufficient basis for the imposition of a capital sentence. Finally, Kemp has not shown that the trial court's alleged failure to re-*voir dire* the jury as to homosexual bias was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Mu'Min*, 500 U.S. at 425-26. Accordingly the district court's denial of Kemp's habeas petition is

**AFFIRMED**.